1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

3

4    United States of America,

5                      Plaintiff,

6    vs.                        Criminal Action No. 3:20-cr-42

7    Timothy John Watson,

8                      Defendant.

9

10         Proceedings had in the initial appearance, detention

11   hearing, and arraignment in the above-styled action on November

12   17, 2020, before the Honorable Robert W. Trumble, Magistrate

13   Judge, at Martinsburg, West Virginia.

14

15                          APPEARANCES

16   Appearing in person on behalf of the United States of America:

17         Jarod J. Douglas
           Assistant United States Attorney
18         United States Attorney's Office
           P.O. Box 591
19         Wheeling, West Virginia  26003

20   Appearing via Zoom on behalf of the defendant:

21         Shawn McDermott, Esq.
           Mills McDermott Criminal Law Center
22         1800 West King Street
           Martinsburg, West Virginia  25401

23

24   The defendant was present in person.

25   Proceedings reported by means of digital recording; transcript
     produced by official court reporter.

1                    INDEX TO WITNESSES

2                                                    PAGE

3

4    TESTIMONY OF AGENT MARK MCNEAL

5        Direct Examination by Mr. Douglas            12

6        Cross Examination by Mr. McDermott            44

7        Redirect Examination by Mr. Douglas          66

8        Recross Examination by Mr. McDermott         71

9

10   TESTIMONY OF JOHN JOSEPH WATSON

11       Direct Examination by Mr. McDermott          74

12

13   TESTIMONY OF TAMMY LEE WATSON

14       Direct Examination by Mr. McDermott          87

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Digitally-recorded proceedings in open court.)

 2                   (November 17, 2020, 2:38 P.M.)

 3                            - - -

 4         THE COURT:  Good afternoon, everyone.  Please be

 5  seated.

 6     All right.  If the parties are ready to proceed, Tara,

 7  would you call the case for me, please.

 8         THE CLERK:  This is the case of the United States of

 9  America versus Timothy John Watson, Criminal No. 3:20-cr-42.

10     The Government is represented by counsel, Jarod Douglas,

11  Assistant United States Attorney.  The defendant is present in

12  person and by counsel, Shawn McDermott.

13     Are the parties ready to proceed?

14         MR. DOUGLAS:  The United States is ready, Your Honor.

15         MR. MCDERMOTT:  Defendant is ready, Your Honor.

16         THE COURT:  All right.  Good afternoon, everyone.  As

17  an initial matter, we originally scheduled today for a

18  preliminary hearing on a complaint and a motion for discovery.

19  As a result of a recent indictment that was returned by the

20  grand jury, the preliminary hearing that was scheduled on the

21  motion for discovery is then terminated as moot.  And what

22  we're going to be hearing today is going to be the initial

23  appearance as to the indictment.  We're going to conduct a

24  detention hearing and hold an arraignment.  So that's what's on

25  our agenda for today.
```

1    We'll first turn to our initial appearance.  So with that

2  in mind, let's do this.  The defendant is here in person, first

3  of all, and we have a video conferencing waiver.  And let me

4  ask you, Mr. McDermott, have you discussed the purpose of this

5  video conferencing waiver with your client?

6          MR. MCDERMOTT:  I have, Your Honor.  And just for the

7  record, I contacted the Court yesterday and let them know about

8  an issue that I was having in awaiting a COVID test.  And I was

9  told that I had to quarantine until I got the results of that

10  test back.  And so far I do not have any of the results back

11  yet so of course there was accommodations that were made for me

12  to appear by Zoom today so that we can conduct the initial

13  appearance as well as the detention hearing that's been moved

14  several times already.  So I've had a chance to discuss those

15  issues with my client.  He understands that he has a right for

16  me to be there present in person, and he wishes to waive that

17  right so that we can proceed today on the detention hearing on

18  the initial appearance.

19          THE COURT:  Well, I have a video conferencing waiver

20  that appears to bear his signature.  So you've talked all those

21  things with your client, and he understands that in order to

22  conduct this with you being at a remote location and

23  participating in video conferencing is the reason he signed

24  this waiver; is that correct?

25          MR. MCDERMOTT:  Correct, Your Honor.

```
 1              THE COURT:  All right.  Mr. Watson, you've had an
 2   opportunity to discuss the purpose for a video conferencing
 3   waiver with your attorney.  You understand the purpose of the
 4   video conferencing waiver and have agreed to it by signing this
 5   waiver; is that correct, sir?
 6              THE DEFENDANT:  Yes, Your Honor.
 7              THE COURT:  All right.  I find that the video
 8   conferencing waiver has been properly executed and direct that
 9   it be filed.
10       Now, Mr. Watson, you do understand English; is that
11   correct, sir?
12              THE DEFENDANT:  Yes, Your Honor.
13              THE COURT:  All right.  My name is Robert Trumble.
14   I'm the United States Magistrate Judge.  Would you stand and be
15   sworn by the clerk, please.
16              THE DEFENDANT:  Yes, Your Honor.
17       (The defendant was sworn in.)
18              THE DEFENDANT:  Yes, ma'am.
19              THE COURT:  Thank you, sir.  Please be seated.
20              THE DEFENDANT:  Yes, sir.
21              THE COURT:  Mr. Watson, are you a citizen of the
22   United States?
23              THE DEFENDANT:  Yes, Your Honor.
24              THE COURT:  Would you state your full name for the
25   record, please.
```

```
 1              THE DEFENDANT:  Timothy John Watson.

 2              THE COURT:  And, Mr. Watson, what is your date of

 3    birth?

 4              THE DEFENDANT:  01/13/1990.

 5              THE COURT:  All right, sir.  And do you have a

 6    physical address where you reside?

 7              THE DEFENDANT:  Right now -- Shawn, is that -- I have

 8    an apartment, but I guess it --

 9              THE COURT:  All right.  Before you respond because

10    we're doing this in video conferencing -- and I think for the

11    record, we'll make this very clear.  In order for you to

12    communicate with your attorney, you've been provided a

13    telephone.  And Mr. McDermott is on the other end of a

14    telephone line so that you can have a private conversation

15    should you desire.  Before you decide to speak with your

16    attorney or for that matter, Mr. McDermott, you need to talk

17    with your client, you need to let the Court know so that we can

18    take the information off the record.  And if I need to leave

19    the bench, I'll need to do that.  So before you start to speak

20    with your attorney, just let me know that you want to talk with

21    your attorney, and we will mute the microphone so that it's not

22    made part of the record, and you can speak with your attorney

23    privately.  Do you understand, sir?

24              THE DEFENDANT:  Yes, sir, I do.

25              THE COURT:  All right.  Now, the question that I'm
```

1  asking is that if you were to be released, do you have a -- or

2  where do you reside?  I have an address of 302 South Marshall

3  Street, Apartment 2, in Ranson, West Virginia.  Is that your

4  current address, sir?

5          THE DEFENDANT:  That is my current address; however,

6  if I were to be released with -- to -- it's my understanding

7  that I would be released to my parents' address.

8          THE COURT:  All right.  And we'll address that issue

9  later on; but right now that's where you were residing at the

10 time of the alleged actions in this indictment; is that --

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  -- correct, sir?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  All right.  Do you have a telephone

15 number or a contact number where you can be reached?

16         THE DEFENDANT:  Not at the moment, no, sir, I do not.

17         THE COURT:  All right.  Thank you.

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Mr. Watson, all persons who are charged

20 with a crime are to be brought before a judge as soon as

21 possible after their arrest.  This is an initial appearance --

22 at least this portion of it is today, and we're not here to

23 determine your guilt or innocence; but I am here to let you

24 know of the charges that are pending against you, to let you

25 know you have a right to an attorney and determine whether

1    you'll be released pending your trial or whether we have to set

2    a detention hearing.

3        Now, you are charged in a multi-count indictment here in

4    the Northern District of West Virginia by the grand jury.  You

5    are charged in Count 1 of that indictment with conspiracy to

6    commit offenses against the United States.  You are charged in

7    Count 2 of that indictment with unlawful engaging in the

8    business of manufacturing machine guns.  You are charged in

9    Count 3 of that indictment with illegal possession and transfer

10   of machine guns.  And you are charged in Count 4 of that

11   indictment with possession of an unregistered firearm,

12   specifically a silencer.

13       Now, if you're found guilty of those violations, sir, the

14   maximum penalty for the charge of conspiracy as set forth in

15   Count 1 is up to 5 years of imprisonment, a $250,000 fine, and

16   3 years of supervised release.  As to the unlawful engaging in

17   business and manufacturing machine guns as set forth in Count

18   2, you face up to 10 years of imprisonment, a $250,000 fine,

19   and 3 years of supervised release.  As to the illegal

20   possession and transfer of machine guns as set forth in Count

21   3, it also has a maximum 10 years of imprisonment, $250,000

22   fine, and 3 years of supervised release.  As to Count 4, the

23   possession of an unregistered firearm, specifically a silencer,

24   it also has a potential penalty of up to 10 years of

25   imprisonment, a $250,000 fine, and 3 years of supervised

1    release.

2        As an additional matter, there's a forfeiture allegation

3    that's set forth in the indictment that would apply to you as

4    well.

5        Mr. Douglas, just for confirmation, did I get all those

6    charges and all those penalties correct, sir?

7                MR. DOUGLAS:  That is correct, Your Honor.

8                THE COURT:  All right.  Thank you.

9        You do have -- you should have been provided with a copy of

10   your constitutional rights.  Do you have them there in front of

11   you, sir?

12               THE DEFENDANT:  Yes, Your Honor.

13               THE COURT:  All right.  Well, let's see.

14       Tara, do you have a copy of the constitutional rights there

15   on the table so that I can read them out loud and make sure

16   that I get everything correct in the constitutional rights?

17   All right.  Thank you.

18       All right, sir.  We've provided you with a copy of your

19   constitutional rights, and they should be on the table in front

20   of you.  I'm going to read them to you, and I'd like you to

21   follow along with me, please.

22               THE DEFENDANT:  Yes, Your Honor.

23               THE COURT:  You have a constitutional right to remain

24   silent.  If you give up your right to remain silent, anything

25   you say can and will be used against you in this or any other

1  court of law.  Even if you may have given a statement to the

2  police or others, you have a constitutional right to make no

3  further statement to the authorities.  If you start to make a

4  statement, you have a constitutional right to stop in mid-word

5  or sentence and say no more.  You have a right to counsel to

6  assist you in this matter.  If you cannot afford an attorney,

7  you may qualify to have an attorney appointed to represent you.

8  And whether appointed or retained, you have the right to the

9  assistance of counsel at every stage of the proceedings against

10  you and during any questioning by the authorities.

11      Sir, do you understand your constitutional rights as I've

12  read them to you?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  All right.  You have a right to retain

15  counsel or ask that counsel be appointed for you if you do not

16  have the funds to hire an attorney.  And in this case, you've

17  exercised your right to retain counsel.  Mr. McDermott has been

18  retained by you; is that correct, sir?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  And as a result, should that change in

21  the future, you may apply to the Court for court-appointed

22  counsel should it become necessary in the future.  Do you

23  understand, sir?

24          THE DEFENDANT:  Understood, Your Honor.

25          THE COURT:  All right.  Now, the Government has filed

1   a motion to detain you today so we're going to go ahead and

2   conduct your detention hearing and your arraignments.  So with

3   that in mind, that concludes our initial appearance, and it's

4   now time to turn to our arraignment.

5       Are the parties ready to proceed as to -- or excuse me --

6   as to the detention hearing?  Excuse me.

7               MR. DOUGLAS:  Yes, Your Honor.

8               THE COURT:  Mr. McDermott?

9               MR. MCDERMOTT:  Defense is ready, Your Honor.

10              THE COURT:  All right.  With that in mind, I don't

11  see any waivers on my bench so I'll turn it over to you,

12  Mr. Douglas, if you would, please, sir.

13              MR. DOUGLAS:  Thank you, Your Honor.  Your Honor, the

14  United States calls Special Agent Mark McNeal.

15      (The witness was sworn in.)

16              THE WITNESS:  I do.  Over here?

17              THE COURT:  It's this -- this is the right one.

18              THE WITNESS:  They're opposite in the other

19  courtroom.

20              MR. DOUGLAS:  Your Honor, I have one housekeeping

21  matter just before jumping into the examination of the witness.

22  I am going to be showing the witness 15 marked documents as

23  exhibits as well as a video clip.  I have yesterday sent copies

24  of those by email to Mr. McDermott so he has all of those.  I

25  also brought the hard copy documents of those exhibits I was

1   going to place next to Mr. Watson here.

2            THE COURT:  All right.  Mr. McDermott, I understand

3   that you've received the documents that the Government intends

4   to introduce as part of this detention hearing; is that

5   correct, sir?

6            MR. MCDERMOTT:  I have, Your Honor.

7            THE COURT:  And to the extent that they are marked,

8   I'm assuming that Mr. Douglas will at some point either choose

9   to introduce them as to evidence, and then you can speak any

10  objection or agree to that as we proceed.

11           MR. MCDERMOTT:  Thank you, Your Honor.

12           MR. DOUGLAS:  And, Your Honor, I do have a court copy

13  too --

14           THE COURT:  Thank you.

15           MR. DOUGLAS:  -- I'm tendering to the clerk.

16      Your Honor, because I'm going to be using my laptop for

17  the video clip, is it okay if I remain at counsel table for

18  this?

19           THE COURT:  It is, sir.

20           MR. DOUGLAS:  Thank you.

21                      DIRECT EXAMINATION

22  BY MR. DOUGLAS:

23  Q.  Agent McNeal, please speak into the microphone and

24  introduce yourself to the Court.

25  A.  My name is Special Agent Mark McNeal with the FBI.

1   Q.  Sir, in that capacity, were you involved in an
2   investigation of Timothy John Watson, the defendant?
3   A.  Yes.
4   Q.  Was that a joint investigation with other agencies?
5   A.  Yes, it was.
6   Q.  And did those other agencies include the ATF and the U.S.
7   Postal Inspection Service?
8   A.  Yes.
9   Q.  Just as a general matter, what did that investigation
10  reveal?
11  A.  It revealed that Mr. Watson was manufacturing illegal
12  machine gun parts in his apartment and distributing them
13  throughout the country.
14  Q.  And were those devices what the ATF refers to as drop-in
15  auto sears?
16  A.  Yes.
17  Q.  And just to be clear, has the ATF been able to actually
18  examine some of these devices sold by Mr. Watson?
19  A.  Yes.
20  Q.  And was one of those devices one that was sold to a
21  customer in Minnesota?
22  A.  Yes, it was.
23  Q.  I gave you to take up to the stand with you some marked
24  exhibits.  And if you'd take a look at Exhibit No. 1.  Is
25  Exhibit No. 1 a photograph taken by the ATF of one of the

1    Minnesota devices?

2    A.   Yes, it is.

3              MR. MCDERMOTT:   Excuse me, Your Honor.   I've lost the

4    picture of the witness.

5              THE COURT:   All right.   Give us one moment.

6              MR. MCDERMOTT:   It's showing a picture of the exhibit

7    and that's all I see.

8              THE COURT:   Well, Mr. Douglas --

9              MR. DOUGLAS:   Yes, sir.

10             THE COURT:   -- and Mr. McDermott, since we all have

11   copies of the exhibit, and they're all labeled, do we need to

12   display them?

13             MR. DOUGLAS:   No.   Only when we get to the video.   So

14   we can just --

15             THE COURT:   All right.   When we get to the video.

16   So, therefore, we can just continue to display the witness on

17   the stand; and if you would be specific when you're referring

18   to a particular exhibit so that we all know what you're talking

19   about.   Okay?

20             MR. DOUGLAS:   Yes, Your Honor.

21             THE COURT:   Mr. McDermott, does that work for you,

22   sir?

23             MR. MCDERMOTT:   That works better.   Thank you, Your

24   Honor.

25             THE COURT:   All right.

1   BY MR. DOUGLAS:

2   Q.   Okay, Agent McNeal, so I'm asking you to look at what has

3   been marked as Government's Exhibit No. 1 there.

4   A.   Yes.

5   Q.   And I believe you testified that that is a photograph from

6   the ATF of one of the Minneapolis subject's purchased --

7   A.   Yes.  That is correct.

8   Q.   Okay.

9            THE COURT:  Mr. Douglas, I'm going to interrupt for

10   just a second.  Just to be clear, I have Exhibit 1-A and 1-B.

11            MR. DOUGLAS:  1-A.  Yes, I'm sorry.  I did change it

12   to 1-A because of the CD, yes.

13            THE COURT:  So we're --

14            MR. DOUGLAS:  It's 1-A.

15            THE COURT:  -- referring to Exhibit 1-A --

16            MR. DOUGLAS:  1-A.

17            THE COURT:  -- just so that I'm not missing anything;

18   correct?

19            MR. DOUGLAS:  You're right, Your Honor.  Yes.

20            THE COURT:  Mr. McDermott, is your -- are your

21   exhibits marked the same way?

22            MR. MCDERMOTT:  No.  I only have Exhibit 1, Judge.

23            MR. DOUGLAS:  Because I ended up putting the clip on

24   a CD calling it 1-B and changed that to 1-A.  That's the only

25   change I made to the exhibits I sent to him.  Everything else

1    is 2 through 15.

2              MR. MCDERMOTT:  Okay.  So this -- what used to be

3    Exhibit 1 is now 1-A?

4              MR. DOUGLAS:  Correct.  Correct.

5              MR. MCDERMOTT:  That's fine, Your Honor.

6              THE COURT:  All right.  Thank you.  Go ahead,

7    Mr. Douglas.  I apologize for the interruption.

8              MR. DOUGLAS:  No.  That's my mistake.

9    BY MR. DOUGLAS:

10   Q.  Did the ATF also test-fire that device that's depicted or

11   one like it from the Minnesota subject?

12   A.  Yes, they did.

13   Q.  And what was in -- what was involved in that process?

14   A.  The device was taken and fitted into the lower receiver of

15   an AR-15 or it could have been an M-16.  I'm not a hundred

16   percent sure.  It was fitted into the lower receiver of a

17   semiautomatic weapon.

18   Q.  And what was the result of that?

19   A.  It converted the weapon to fully automatic.

20   Q.  And did the ATF examiner fire the weapon automatically with

21   one trigger pull?

22   A.  Yes.

23   Q.  Okay.  I want you to take a --

24             MR. DOUGLAS:  We would move to introduce Exhibit 1.

25             THE COURT:  All right.  Any objection to the

1    introduction of --

2              MR. DOUGLAS:  1-A.  1-A.

3              THE COURT:  I'm sorry?

4              MR. DOUGLAS:  1-A.  I'm sorry.

5              THE COURT:  All right.  Mr. McDermott, any objection

6    to the introduction of Government's Exhibit 1-A into evidence?

7              MR. MCDERMOTT:  No.  Not for purposes of this

8    hearing, Your Honor.

9              THE COURT:  All right.  It'll be so admitted as

10   Exhibit 1-A.

11       (Government's Exhibit No. 1-A was admitted.)

12   BY MR. DOUGLAS:

13   Q.  Agent McNeal, did the ATF also have the opportunity to

14   examine other devices purchased through Mr. Watson's business?

15   A.  Yes.

16   Q.  Were there additional devices purchased by an undercover

17   FBI agent?

18   A.  Yes, there was.

19   Q.  And was that just last month in October?

20   A.  That is correct.

21   Q.  Okay.  And did the ATF also test-fire one of those devices?

22   A.  They did test-fire one of those devices, and they got the

23   same result.  It transformed the semiautomatic weapon into a

24   fully automatic weapon.

25   Q.  Okay.  And did the ATF video and audio record that test?

1   A.   They did.

2   Q.   Is that clip on Exhibit 1-B?

3   A.   Yes, it is.

4           MR. DOUGLAS:  Your Honor, we would move to introduce

5   Exhibit 1-B and play that video.

6           THE COURT:  Mr. McDermott, I understand that you've

7   received a copy of the video clip and that we've had some

8   technical difficulties in displaying that by video Zoom today.

9   Do you have any objection to the admission of Exhibit 1-B?

10          MR. MCDERMOTT:  No, Your Honor.  I viewed it, and I

11  have no objection for purposes of this hearing.

12          THE COURT:  All right.  Now, Mr. McDermott, in order

13  to display that here in the courtroom today, we may lose the --

14  some of the witnesses that are present on the screen right now

15  if the same situation occurs as did a few minutes ago when we

16  had the Exhibit 1-A up on the screen.  So for the purposes of

17  this hearing and to make the record complete, Mr. Douglas is

18  going to at this point play the video, 1-B.

19     (Play video.)

20  BY MR. DOUGLAS:

21  Q.   Agent --

22          THE COURT:  All right.

23          MR. DOUGLAS:  Yeah.

24          THE COURT:  Just for the record, the Exhibit 1-B is

25  admitted into evidence without objection.

```
 1        (Government's Exhibit No. 1-B was admitted.)

 2            MR. DOUGLAS:  Thank you, Your Honor.

 3   BY MR. DOUGLAS:

 4   Q.  Agent McNeal, did that video depict the ATF examiner first

 5   firing a weapon just as a semiautomatic weapon?

 6   A.  Yes.

 7   Q.  Did that video then depict an installation of one of these

 8   devices that was purchased from Mr. Watson's business?

 9   A.  Yes, it did.

10   Q.  And what did that show was the result?

11   A.  It converted the weapon from semiautomatic to fully

12   automatic.

13   Q.  Agent McNeal, as part of the investigation, did the

14   investigators look into customers who had purchased these

15   items --

16   A.  Yes.

17   Q.  -- through this online business?

18   A.  Yes, we did.

19   Q.  Did records show that one of the purchasers early in

20   January of 2020 was a Steven Carrillo, C-A-R-R-I-L-L-O?

21   A.  Yes.

22   Q.  And did those records also include a specific billing

23   address, a street address?

24   A.  Yes.

25   Q.  Does that person's name and the street address match up
```

1  with any individual that has been investigated or arrested by

2  the FBI or law enforcement?

3  A.  Yes.  Steven Carrillo back in I believe it was May of 2020,

4  he shot and killed a federal guard at a federal building.  He

5  was not taken into custody.  He was not captured at that time.

6  A month later, investigators went to his home, and he shot a

7  sheriff's deputy at that location.  And the address of his home

8  where he shot the sheriff's deputy matches the address where he

9  ordered from Mr. Watson and had one of these devices sent to

10  him.

11  Q.  To be fair, there is no evidence that Mr. Carrillo used one

12  of these devices in those shootings?

13  A.  That's correct.

14  Q.  And specifically with regard to that Minnesota customer,

15  was he a subject of an FBI investigation?

16  A.  He was.  He -- he believed that he was supplying members of

17  Hamas, an international terrorist organization, with drop-in

18  auto sears.  He was actually dealing with an FBI undercover.

19  Q.  Again, to be fair, there's currently no known evidence that

20  Mr. Watson knew that this person was intending to provide these

21  devices onto a foreign terrorist organization?

22  A.  That is correct.

23  Q.  Okay.  But let's talk about how this business was set up.

24  Around how many shipments were made from this business?

25  A.  Roughly 800.

1   Q.   And are we talking about what?  Since the beginning of

2   2020?

3   A.   Yes.

4   Q.   Okay.  And about how many states were these devices shipped

5   to.

6   A.   All fifty states.

7   Q.   Have you reviewed the website that they were purchased

8   from?

9   A.   Yes.

10  Q.   Did that website include language that invited the use of

11  false names?

12  A.   It did.  It encouraged people to order under whatever name

13  they would like and that their identities would be kept secret.

14  Q.   Did the Minnesota subject tell the FBI how he had learned

15  about the website?

16  A.   Yes.  He said he was informed of the portable wall hangers

17  website through Boogaloo forums.

18  Q.   What is Boogaloo?

19  A.   It's a movement for people who believe that the government

20  has too much overreach.  They're anti-law enforcement,

21  anti-government.

22  Q.   Was Steven Carrillo a self-claimed Boogaloo adherent?

23  A.   Yes, he was.

24  Q.   What about the Minnesota subject?

25  A.   Yes.

1  Q.  Was there advertising on the website tailored to attract

2  Boogaloo adherence?

3  A.  Yes.

4  Q.  What's an example?

5  A.  There was a fund set up that 10 percent -- I believe it was

6  10 percent of all proceeds would go to the GoFundMe page for

7  Duncan Lemp.

8  Q.  And that was right on the website?

9  A.  Right on the website.  And Duncan Lemp was a -- he was a

10  man that lived in Potomac, Maryland, back in -- I can't

11  remember the date.  I think it was maybe June.  There was a

12  no-knock warrant issued for his residence because he was

13  thought to be in possession of an illegal firearm.  He was shot

14  and killed during that incident.

15  Q.  Based on your experience and training, is it understood

16  that Boogaloo adherence treated Duncan Lemp as a martyr of

17  sorts?

18  A.  Yes, they do.

19  Q.  Did this investigation ultimately result in the execution

20  of a federal search warrant on the residence of Mr. Watson?

21  A.  Yes, it did.

22  Q.  Did you also have in hand an arrest warrant on a criminal

23  complaint issued by this judge?

24  A.  Yes, we did.

25  Q.  Did you also have on hand a search warrant for a vehicle

1    associated with Mr. Watson?

2    A.   Yes, we did.

3    Q.   Were you part of the team who entered Mr. Watson's

4    residence that day?

5    A.   Yes, I was.

6    Q.   And was that on November 2, 2020?

7    A.   It was.

8    Q.   What did you see when you entered the residence?

9    A.   After moving through the apartment and moving back to

10   Mr. Watson's bedroom, there was a 3D printer that was actively

11   printing out eight drop-in auto sears.

12   Q.   I want to move to the next exhibit you have.  First of all,

13   let me ask you generally.  Were there photographs taken during

14   the execution of this search warrant?

15   A.   Yes, there was.

16   Q.   Okay.  Is Government Exhibit No. 2 an example of one of

17   those photographs taken at the search warrant --

18   A.   Yes.

19   Q.   -- execution?

20   A.   Yes, it is.

21   Q.   What does it depict?

22   A.   It shows the 3D printer with the eight drop-in auto sears.

23             MR. DOUGLAS:  Your Honor, we would move to introduce

24   Government Exhibit No. 2.

25             THE COURT:  Mr. McDermott, any objection to the

1   introduction of Government's Exhibit No. 2?

2           MR. MCDERMOTT:  My only question, Judge, are these

3   pictures that were taken at the residence or later on at --

4           MR. DOUGLAS:  Isn't that what cross examination is

5   for?

6           MR. MCDERMOTT:  Yeah.  I'm just wondering where the

7   pictures -- I don't think there was a basis established of

8   where it was taken.

9   A.  It was at the residence.

10          MR. DOUGLAS:  I said during the execution of the

11  warrant.

12  A.  Yes.

13  BY MR. DOUGLAS:

14  Q.  So these photographs we're about to look at, were they

15  taken at the residence?

16  A.  Yes, they were.

17  Q.  Of objects in the residence?

18  A.  Yes.  Correct.

19  Q.  Okay.

20          THE COURT:  All right.  Mr. McDermott, any objection

21  to the introduction of Exhibit No. 2, Government's Exhibit

22  No. 2?

23          MR. MCDERMOTT:  No, Your Honor.

24          THE COURT:  All right.  Government's Exhibit No. 2

25  will be admitted into evidence.

1      (Government's Exhibit No. 2 was admitted.)

2           MR. DOUGLAS:   Thank you, Your Honor.

3  BY MR. DOUGLAS:

4  Q.   I do want to just look a little deeper at No. 2 here just

5  so we're all clear.   Do you see where there's a yellow card

6  with a number 32?

7  A.   Yes.

8  Q.   Looks like an evidence number or something?

9  A.   Yes.   That's an evidence number.

10  Q.   And what is that intended to mark there?

11  A.   It just indicates that that is item number 32.

12  Q.   And are those the drop-in auto sears you were discussing?

13  A.   Yes.   The placard above it that says 31 would be for the

14  printer itself.

15  Q.   Uh-huh.

16  A.   And 32 would denote where the auto sears were found and

17  that they would be entered into evidence separately from the

18  printer.

19  Q.   Thank you.   Were there also additional auto sears not

20  laying on the printer but found elsewhere in that residence on

21  November 2nd?

22  A.   Yes.   I believe the number was 89, but it was definitely

23  over 80.

24  Q.   Was there a photograph taken in the residence on November

25  2nd of a pile of those auto sears?

1    A.   Yes.

2    Q.   Is that depicted in Government Exhibit No. 3?

3    A.   Yes, it is.

4         MR. DOUGLAS:  Your Honor, we'd move to introduce

5    Government Exhibit No. 3.

6         THE COURT:  Mr. McDermott, any objection to the

7    introduction of Government's Exhibit No. 3?

8         MR. MCDERMOTT:  No, Your Honor.

9         THE COURT:  Government Exhibit No. 3 will be admitted

10   into evidence.

11      (Government's Exhibit No. 3 was admitted.)

12   BY MR. DOUGLAS:

13   Q.   What is marked here by the number 59 evidence tag on

14   Government Exhibit 3?

15   A.   That would indicate that that is the 59th item of evidence

16   that would be entered into our evidence log.

17   Q.   And what are those items?

18   A.   Those items are drop-in auto sears, 3D printed.

19         MR. DOUGLAS:  And, Your Honor, just to streamline

20   this a bit instead of chopping it up --

21   BY MR. DOUGLAS:

22   Q.   Agent McNeal, please look at Exhibit 4, 5, 6, 7, 8, 9, 10,

23   11 and stop there.  Are those other photographs taken during

24   the execution of the federal search warrant at Watson's

25   residence on November 2, 2020?

1  A.  Yes.

2  Q.  And are those depicting different firearms, firearm

3  silencers, different tactical gear and the like?

4  A.  Yes.

5        MR. DOUGLAS:  Your Honor, we'd move to admit Exhibits

6  4 through 11.

7        THE COURT:  Mr. McDermott, any objection to the

8  admission of Government's Exhibits 4 through 11?

9        MR. MCDERMOTT:  Not for purposes of this hearing,

10  Your Honor.

11        THE COURT:  Okay.  Exhibits -- Government's Exhibits

12  No. 4 through 11 will be admitted into evidence.

13     (Government's Exhibit Nos. 4 through 11 were admitted.)

14  BY MR. DOUGLAS:

15  Q.  Agent McNeal, please take a look at Exhibit 4.  What does

16  that depict?

17  A.  It is 3D printed parts that when combined make a

18  suppressor.

19  Q.  Like a firearm silencer?

20  A.  Yes.

21  Q.  And did the ATF, in fact, test these?

22  A.  They did.  They actually found -- one of the rifles in

23  Mr. Watson's apartment had a fitting on the end of it that once

24  these four items were placed together to create the suppressor,

25  it attached to that rifle.  ATF -- I don't know if they tested

1  it on that rifle or not, but they tested this suppressor, and

2  it met the qualifications to legally be a suppressor.  It

3  brought the decibels down low enough to be an actual silencer.

4  Q.  Okay.  And is that the subject of Count 4 which the grand

5  jury found probable cause of?

6  A.  Yes.

7  Q.  Okay.  Let's take a look at Government Exhibit No. 5.  What

8  is depicted in that exhibit?

9  A.  A rifle.

10  Q.  Is this rifle currently under analysis to determine whether

11  it is a short-barrel rifle?

12  A.  Yes.  The upper receiver on this rifle is a

13  ten-and-a-half-inch upper receiver which depending on the

14  configuration, it could be illegal.  ATF is still trying to

15  determine that.

16  Q.  Take a look at Government Exhibit No. 6.  What is depicted

17  in that exhibit?

18  A.  I would also just like to state that --

19  Q.  Yes, sir.

20  A.  -- for number 5 --

21  Q.  Yes.

22  A.  -- you can see on the front of it that that's the fitting

23  that the suppressor went on.  The black piece that's sticking

24  out from the front of the barrel.  So this was the weapon that

25  this suppressor was set up to go to be hooked onto.

1  Q.  You mean the firearm depicted in Government Exhibit No. 5

2  was fitted for --

3  A.  Correct.

4  Q.  -- the suppressor?

5  A.  Correct.

6  Q.  Okay.  Now, can you tell us what is depicted in Government

7  Exhibit No. 6?

8  A.  It's a tactical vest and a Kevlar helmet.  It appears to be

9  a Kevlar helmet.  It has a cover on it.  It looks like it has a

10  swing arm on the front for night vision goggles.

11  Q.  Can you read what it says on the helmet there?

12  A.  It says -- it says "double tap."  If memory serves right,

13  it says something like make sure you're careful or you're sure.

14  Always double tap.

15  Q.  Okay.  Please take a look at Government Exhibit No. 7.

16  What is depicted in that exhibit?

17  A.  A pistol.

18  Q.  Does it bear an engraving?

19  A.  It does.

20  Q.  What does the engraving say?

21  A.  It says the Biden Express.

22  Q.  Oh.  Please take a look at Government Exhibit No. 8.  What

23  is depicted there?

24  A.  A rifle.

25  Q.  And number 9?

1    A.   A pistol with a magazine with rounds in it.  A clip.

2    Q.   Number 10?

3    A.   Another rifle.

4    Q.   What is shown here in number 11?

5    A.   There is one pistol, and it looks like a second pistol that

6    might be in a holster.

7    Q.   What about next to the bed leaning up against the wall?

8    A.   A rifle.

9    Q.   And let me ask, was this how these items were positioned

10   upon entering the residence?

11   A.   Yes.

12   Q.   Where is this?  What room?

13   A.   This is in the bedroom.

14   Q.   So there's two handguns on the nightstand and a rifle

15   leaning up against the wall?

16   A.   Correct.

17   Q.   Was there also a rifle on the other side of the bed leaning

18   up against the wall?

19   A.   I believe so, and I believe there was a rifle laying on the

20   bed.

21   Q.   Okay.  So that picture that you were talking about, that

22   being fitted for a silencer, that was laying on the bed or was

23   it another --

24   A.   I believe that was the weapon that was laying on the bed,

25   yes.

1  Q.  So it wasn't placed on the bed or do you know for sure?

2  A.  It wasn't placed on the bed by agents.  It was just there.

3  Q.  Okay.

4  A.  To the best of my knowledge.

5  Q.  Okay.  Now, before moving to the next set of exhibits, were

6  you part of the team that arrested Mr. Watson?

7  A.  I was not.

8  Q.  Okay.  Were you later informed about how his arrest went?

9  A.  Yes, I was.

10  Q.  Were you informed about what was located in or around his

11  person?

12  A.  Yes.

13  Q.  Did that include a firearm, ammunition, and a knife?

14  A.  It did.

15  Q.  Okay.  Please take a look at Government Exhibits 12, 13,

16  14, and 15.  Are those photographs of those items?

17  A.  Yes, they are.

18          MR. DOUGLAS:  Your Honor, the Government moves to

19  admit Government Exhibits 12 through 15.

20          THE COURT:  Mr. McDermott, any objection to the

21  admission of Government's Exhibits 12 through 15?

22          MR. MCDERMOTT:  Sorry.  I lost you there for a

23  second, Your Honor.

24          THE COURT:  Any objection to the admission of

25  Government's Exhibits 12 through 15?

```
 1              MR. MCDERMOTT:  No.  Not for purposes of this
 2   hearing.
 3              THE COURT:  All right.  Exhibits No. -- Government's
 4   Exhibits 12 through 15 will be admitted into evidence.
 5         (Government's Exhibit Nos. 12 through 15 were admitted).
 6              THE COURT:  You may proceed, Mr. Douglas.
 7              MR. DOUGLAS:  Yes.  Thank you, Your Honor.
 8   BY MR. DOUGLAS:
 9   Q.  Agent McNeal, please take a look at Government Exhibit 12.
10   Does that depict a handgun that was found on the person of
11   Mr. Watson?
12   A.  Yes, it does.
13   Q.  Has the ATF also looked at this handgun?
14   A.  Yes.
15   Q.  What have they determined from looking at this handgun?
16   A.  They determined it did not have a serial number.
17   Q.  And is there technically an exception to having a serial
18   number if it's made for personal use if it's literally created
19   at home?
20   A.  Yes.
21   Q.  And did the agents -- did the agents believe based on a
22   search of that residence that this was one that was created?
23   A.  That's what they believe, yes.
24   Q.  Okay.  But there still is no serial number on it?
25   A.  Correct.
```

1    Q.   Not that that's illegal --

2    A.   Correct.

3    Q.   -- but there isn't one on it; right?

4    A.   That's correct.

5    Q.   And Government Exhibit 13.  Does that depict the magazines

6    that he had?

7    A.   Yes.

8    Q.   And were they all filled?

9    A.   Yes.

10   Q.   And 14.  Is that also the same magazines just from another

11   angle?

12   A.   Yes.

13   Q.   Looking at the first magazine in that row of three

14   magazines, it looks like there's something with the tip of the

15   ammunition there.

16   A.   Yes.

17   Q.   What's that?

18   A.   That magazine has hollow-point rounds.

19   Q.   So he had also some hollow-point --

20   A.   Yes.

21   Q.   -- rounds of ammunition with him as well?

22   A.   Right.

23   Q.   And then number 15.  Is that the knife --

24   A.   Yes.

25   Q.   -- that he had?

1    A.   Correct.

2    Q.   Okay.  Now, following the arrest of Mr. Watson, did the FBI

3    attempt to interview him?

4    A.   Yes.

5    Q.   Ultimately, did Mr. Watson invoke his right to counsel

6    rightfully, and the interview was ultimately concluded -- it

7    really didn't even take place --

8    A.   Right.

9    Q.   -- and he was taken to the regional jail?

10   A.   Yes.

11   Q.   Have you talked to those agents --

12   A.   I have.

13   Q.   -- about what it was like transporting him to that location

14   for the interview and also transporting --

15   A.   Yes.

16   Q.   -- him to the jail?  Okay.  Were there any statements from

17   Mr. Watson about being kidnapped?

18   A.   Yes.  He claimed that the arrest was illegal --

19            MR. MCDERMOTT:  Objection, Your Honor.

20            THE COURT:  State your objection.

21            MR. MCDERMOTT:  First of all, if Mr. Watson

22   invoked -- certainly.  If Mr. Watson invoked his right to

23   counsel, I don't think that these statements can come in as it

24   is anyway.  And then second, again, this is hearsay.  I

25   understand it's a bond hearing where the evidence rules are

1  relaxed, but I think without the -- this is an important issue

2  and without the other agents here to testify on it, I don't

3  think it should be entered into evidence.

4          MR. DOUGLAS:  Your Honor, I appreciate

5  Mr. McDermott's objection, but the evidence rules aren't just

6  relaxed.  They explicitly do not apply.

7          THE COURT:  Yeah, I'm going to overrule your

8  objection, Mr. McDermott, and allow the testimony to continue.

9      You may continue, sir.

10 BY MR. DOUGLAS:

11 Q.  What were you saying about a statement being made from --

12 A.  He made a statement that the arrest was illegal, and he had

13 been kidnapped.  And that was not the only time he made that

14 statement.  I reviewed jail calls that he made from the time he

15 showed up at the Eastern Regional Jail until the 13th of this

16 month, and he had made statements during those calls that he

17 was kid -- illegally kidnapped.

18 Q.  Let me break that down.  First of all, you're saying during

19 or right after the arrest, he said he was being kidnapped?

20 A.  Right.

21 Q.  Did the agents show or at least tell them about an arrest

22 warrant?

23 A.  Yes, they --

24 Q.  Did they show him?

25 A.  They showed him, yes.

1  Q.  And he still said he thinks he's being kidnapped?

2  A.  That's correct.

3  Q.  And we're talking about the arrest warrant issued by this

4  Court?

5  A.  Correct.

6  Q.  Okay.  And then he had time to go to the jail and spend

7  some days; and you're saying even after that, he was still

8  saying on jail calls he had been kidnapped?

9  A.  That's correct.

10  Q.  And that's after he made his initial appearance in federal

11  court?

12  A.  Yes.

13  Q.  Okay.  Now, the investigation was ongoing; is that correct?

14  A.  That's correct.

15  Q.  Is that because there's tons of electronic data that was

16  seized under the search warrant from the residence?

17  A.  Yes.

18  Q.  Okay.  But have there been certain reviews made that you've

19  been made aware of?

20  A.  Yes.

21  Q.  Other electronic devices associated with Mr. Watson?

22  A.  Yes.

23  Q.  Did you find anything in there that would cause you concern

24  for him to be released?

25  A.  Yes.  There were some documents -- I don't know if I would

1    call them manuals because I don't know how complete they were,

2    but there were several documents that were found on the tablets

3    or laptops that were seized from Mr. Watson.

4    Q.  What are some examples of those -- what you're calling

5    manuals or products?

6    A.  There's one for *100 Deadly Skills:  The SEAL Operative's*

7    *Guide to Eluding Pursuers, Evading Capture, and Surviving Any*

8    *Dangerous Situation*; *Improvised Munitions Handbook*; *Undetected*

9    *Hand Grenades*; *Modern Firearm Silencers*; *The Anarchists*

10   *Arsenal:  Improvised Incendiary and Explosive Techniques*; *Booby*

11   *Traps*; and *Techniques of Silent Killing*.

12   Q.  What is *Techniques of Silent Killing*?

13   A.  I -- we have not looked into the manual yet.  That was just

14   what we saw on --

15   Q.  Did you see any images in it?

16   A.  Yes.  There was an image on the front of -- it was a crude

17   drawing of someone holding someone's head back from behind with

18   a knife held high in the air.

19   Q.  Was there also a document or manual called *Ambush*

20   *Formations*?

21   A.  Yes.

22   Q.  Have you reviewed any videos of Mr. Watson practicing

23   certain techniques?

24   A.  Yes.  There was a video that was found of him practicing a

25   quick draw from concealment, and then there was another video

1  of him -- he was in the woods.  He runs up into the frame and

2  fires several bursts from -- it looked like an AR-type weapon.

3  Drops it down and draws for his side arm, fires a few rounds,

4  and does a quick load.  Changes out the clips and fires again.

5  Q.  Now, at the time that the search warrant was executed on

6  November 2nd, did Mr. Watson have a live-in girlfriend?

7  A.  Yes, he did.

8  Q.  What is her name?

9  A.  Emily Cross.

10 Q.  Okay.  Did investigators interview Ms. Cross at the

11 residence that day?

12 A.  Yes.

13 Q.  Did the investigators seize a written journal of Ms. Cross

14 that day?

15 A.  Yes.

16 Q.  Has Ms. Cross subsequently confirmed and corroborated the

17 authenticity of that journal as being her handwriting?

18 A.  Yes, she has.

19 Q.  Has Ms. Cross retained an attorney and sat through another

20 interview --

21 A.  Yes, she has.

22 Q.  -- with the FBI?

23 A.  Yes.

24 Q.  Voluntarily?

25 A.  Yes, voluntarily.

1    Q.   Did the FBI find anything of relevance in the written

2    journal?

3    A.   Yes.  She had written down a statement that said, quote,

4    "Also he's making these, quote, 'portable wall hangers' that's

5    nothing but a 3D printed drop-in auto sear for firearms.  It's

6    100 percent illegal in all forms, and I am scared that it will

7    eventually" -- and then it just dot, dot, dot.

8    Q.   Nothing --

9    A.   Nothing.

10   Q.   It stops at the bottom of that page?

11   A.   Right.

12   Q.   Anything else in the journal?

13   A.   She had written down, quote, "You don't make me happy with

14   your I'm gonna kill 'ems or the I'm gonna blow up that building

15   or raid here or there or deface federal property."

16   Q.   Regarding these two statements you've just read, has Emily

17   Cross explained that when she said, "He's making these portable

18   wall hangers that's nothing but a 3D printed drop-in auto sears

19   for firearms," she's talking about Timothy Watson?

20   A.   That's correct.

21   Q.   The defendant?

22   A.   Yes.

23   Q.   And that when she said, "You don't make me happy with your

24   I'm gonna kill thems," she's talking about Timothy John Watson,

25   the defendant?

1    A.   Correct.

2    Q.   And when she said, "You're gonna blow up that building,"

3    she's talking about Timothy John Watson, the defendant?   "Raid

4    here or there and deface federal property."   She's talking

5    about hearing that from Timothy John Watson, the defendant?

6    A.   Right.   Correct.   We also got clarification from her on

7    what --

8    Q.   Well, let me ask you -- let me --

9    A.   Sorry.

10   Q.   Hold on.   Let me ask you when you did the follow-up

11   interview or some of your colleagues or colleague did a

12   follow-up interview, we're talking about with a counsel

13   present?

14   A.   Correct.

15   Q.   Okay.   Did Ms. Cross elaborate on these "I'm gonna kill

16   thems or blow up that building"?

17   A.   Yes.

18   Q.   What did she say?

19   A.   She said that when referring to blow up that building that

20   Mr. Watson was referring to the IRS building in Martinsburg.

21   Q.   Did she describe the context of when that was said or why

22   that was said?

23   A.   He was upset about being able to pay his taxes with cash.

24   Q.   That he wanted to pay them with cash?

25   A.   He wanted to pay them in cash, but because of COVID, he was

1  told that he could not show up and pay in cash.

2  Q.  And was there actually a video on Ms. Cross's phone of them

3  going to the tax office to try to pay with cash?

4  A.   There's a video on her phone.  It appears that Mr. Watson

5  is recording it.  It seems like -- I don't hear anyone else in

6  the video except for him talking to the lady that works at the

7  tax office asking if he can pay with cash and stating that he

8  should be able to.  And she said that because of the COVID

9  restrictions, he wasn't allowed to.

10 Q.  Did that video pick up anything else about what he said

11 about that later?

12 A.   That video did not, but there is another video on the phone

13 that we seized from Ms. Cross.  It was a recording -- it was a

14 video, but it was blacked out.  Like I don't know if it was

15 recorded accidently or if it was just -- the camera was facing

16 down, but he made the comments in referring to obviously his

17 tax issue.  And I don't know for sure if he's referring to the

18 woman in the video that we previously talked about, but he's

19 obviously upset about his taxes, and he's talking about making

20 a phone call to the tax office to get some information.  And he

21 said, quote, "Those people need to fucking die."  And then he

22 also said, quote, "Before COVID-19 ends, the world might call

23 me a crazed gunman."

24 Q.  And was this tax incident -- is there evidence about when

25 that would have been?  Like was that in 2020?

1    A.   It was in 2020, yes.

2    Q.   Okay.  Was there one more statement of relevance in the

3    journal of Emily Cross?

4    A.   She had made a statement that "What happened to the Tim I

5    used to know and what Tim am I going to get today?"

6    Q.   Okay.  Did Ms. Cross also tell the FBI about a statement

7    Mr. Watson had made, "If they show up here, it won't be

8    pretty"?

9    A.   Yes.  When we initially interviewed her, she stated that he

10   had made that statement referring to law enforcement officers.

11   If anyone came to his door for arrest, a search, that it

12   wouldn't be pretty.

13   Q.   Did she elaborate on how she took that?  What she took that

14   to mean?

15   A.   She took that as it would be violent.

16   Q.   From him?

17   A.   From him.

18   Q.   Toward law enforcement?

19   A.   Correct.

20   Q.   You had mentioned that you reviewed some jail calls.

21   You're talking about from the Eastern Regional Jail since

22   Mr. Watson's detention?

23   A.   That's correct.

24   Q.   Did he say anything in those about -- jail calls about not

25   being able to make it in jail?

1  A.  Yes.  He stated several times that he can't live in jail
2  and that he had to get out.  That he had been kidnapped.
3  Q.  Was there a call in there or more calls than one with his
4  girlfriend, Emily Cross?
5  A.  Yes.
6  Q.  Did he make any statements to her that were of interest to
7  you?  Did he make any statements to her about wanting to marry
8  her?
9  A.  He did.  I believe it was the first phone call that he made
10  he -- he wasn't talking to her.  He was talking to his parents.
11  Q.  Okay.
12  A.  And he said that he needed to -- they needed to get in
13  touch with Emily because they had to get married immediately.
14  It was imperative that they get married right now.
15  Q.  Did he come right out and mention the marital privilege or
16  --
17  A.  He did not.
18  Q.  Okay.  But he said, "We need to get ahold of her; we need
19  to get married immediately"?
20  A.  Yes.  Today.
21  Q.  Okay.  And that's the girl who had been living at that
22  residence where the 3D printed drop-in auto sears had been
23  printed?
24  A.  That is correct.
25  Q.  And the firearm silencer had been seized?

1   A.   Correct.

2            MR. DOUGLAS:   Your Honor, no further questions.

3            THE COURT:   Mr. McDermott, cross examination.

4            MR. MCDERMOTT:   Thank you, Your Honor.

5                       CROSS EXAMINATION

6   BY MR. MCDERMOTT:

7   Q.   Now, Agent, in the first part of your testimony, you talked

8   about these portable wall hangers that were seized by other

9   agents and that were then tested by the ATF.   You recall that;

10  correct?

11  A.   Correct.

12  Q.   And, Agent, I believe that when you were asked those

13  questions, you were referred to Government's Exhibit 1-A;

14  correct?

15  A.   That is correct.

16  Q.   And do you have that exhibit in front of you right now?

17  A.   Yes, I do.

18  Q.   Okay.   Now, if you're looking at the Exhibit 1-A, you see

19  that there's -- it looks like three separate --

20       (Audio distortion.)

21  A.   Correct.

22  Q.   -- in Exhibit 1-A.   Do you see that?

23  A.   Correct.

24  Q.   So those parts on the top would have been connected to that

25  part on the bottom, correct, and that would have been the

1   portable wall hanger?

2   A.   That depends on how they were shipped.   Some are shipped

3   just the portable wall hanger itself, and some are shipped

4   attached to the mounting bracket.

5   Q.   Okay.   So there's some --

6       (Audio distortion.)

7           THE COURT:   Mr. McDermott, your signal broke up.   You

8   need to repeat the question for me, please.

9           MR. MCDERMOTT:   Okay.

10  BY MR. MCDERMOTT:

11  Q.   Agent, do you know how Exhibit 1-A --

12      (Audio distortion.)

13          THE COURT:   Do you need it repeated, sir?

14          THE WITNESS:   I do, please.

15          THE COURT:   All right, Mr. McDermott, one more time.

16          MR. MCDERMOTT:   Can you guys hear me?

17          THE COURT:   We can now.   Please repeat your question.

18  BY MR. MCDERMOTT:

19  Q.   Agent, do you know how -- do you know how Exhibit 1-A was

20  shipped?   Was it together or apart?

21  A.   I do not know how it was shipped.

22  Q.   Okay.   And when you're looking at Exhibit 1-A though,

23  there's two parts above attached to that part below to create

24  the entire portable wall hanger; correct?

25  A.   Correct.

1  Q.  Now, you said that the agents were able to take that part

2  below of the portable wall hanger, the hook on the portable

3  wall hanger, and insert it into a firearm that made it

4  automatic; correct?

5  A.  Correct.

6  Q.  Now, do you recall what the agents had to do to that hook

7  to make it actually work as a part that would convert the

8  firearm to automatic?

9  A.  Yes.  The ATF said that as these are shipped, they're

10  considered machine guns; but to get them to fit into the AR-15,

11  there's a little portion that needs to be filed and then placed

12  in.

13  Q.  When you say a little portion that needs to be filed, do

14  you know what has to be manually filed off of the hook to make

15  it work in a gun?

16  A.  I do not.

17  Q.  Okay.  Have you talked to the agents about what had to be

18  filed?

19  A.  I did speak to the ATF.  They kind of described it to me,

20  but I don't know exactly where it needed to be filed; but they

21  assured me that even if it was not filed, it's still considered

22  a machine gun.

23  Q.  So, again, I understand what the agents told you about what

24  they believe the --

25  A.  Yes.

1  Q.  -- commission of a machine gun is, but it's fair to say

2  that the hook part would have to be modified in some way before

3  it could work as a machine gun; correct?

4  A.  Correct.

5  Q.  And it's your testimony that you don't know how much it

6  would have to be modified; correct?

7  A.  I do not know how much.

8  Q.  And you don't know how long it would have taken the agents

9  to modify the hook; correct?

10  A.  I know that the Minneapolis device that was tested, I

11  believe it took 15 minutes for them to do whatever they needed

12  to do to get it fitted into the AR-15.

13  Q.  Do you know what tools they had to use to get it to fit

14  into the AR-15?

15  A.  I do not.

16  Q.  Okay.  You believe that they had to use tools or did they

17  just do it by hand?

18  A.  I think they had to use a tool.

19  Q.  Okay.  Do you know if -- when you're modifying the hook on

20  this portable wall hanger, would it continue to be able to

21  function as a hook after it was modified?

22  A.  I -- yeah, as long as it fit inside the bracket, I don't

23  see why it wouldn't.

24  Q.  Okay.  But you don't know?  You haven't tested that;

25  correct?

1  A.  I have not.
2  Q.  Okay.  Now, the process in terms of modifying these hooks
3  to make them fit into a firearm, you have no evidence that Tim
4  ever told any customers how to do that; correct?
5  A.  I do not.
6  Q.  And, in fact, your evidence is and the conversations that
7  you have I believe with the subject in Minnesota was that Tim
8  had actually said that there's never any reason to modify the
9  geometry of a portable wall hanger; correct?
10  A.  Correct.
11  Q.  So not only did he not give them instructions on how to
12  modify, he also told them not to modify it; correct?
13  A.  He said it didn't need to be modified.  He didn't tell them
14  not to.
15  Q.  Okay.  And let me ask you this.  When asked on how to use
16  the portable wall hangers by customers, Tim would have referred
17  the customers to a video on his website; correct?
18  A.  Correct.
19  Q.  And that video on his website was not showing this portable
20  wall being used in a firearm; correct?
21  A.  That is correct.
22  Q.  It was showing how to attach it to a wall?
23  A.  Correct.
24  Q.  Okay.  Now, the portable wall hangers and the hook --
25      (Zoom distortion.)

```
1    Q.  -- from Mr. Watson's residence, were any --
2              THE COURT:  Mr. McDermott --
3    Q.  -- of them modified in a way that would make them be able
4    to be used in a firearm?
5              THE COURT:  Mr. McDermott, the first part of your
6    question got broken up.  Could you repeat that again for us,
7    please.
8              MR. MCDERMOTT:  Certainly, Judge.
9    BY MR. MCDERMOTT:
10   Q.  Now, the items that were recovered that you are classifying
11   as machine guns, the hook portion of the portable wall hanger,
12   you recall recovering those from Mr. Watson's residence;
13   correct?
14   A.  Yes.
15   Q.  Now, were any of those modified in a way that would make
16   them be able to be inserted and used in a firearm?
17   A.  I don't believe any of those have been examined that
18   closely yet.
19   Q.  Okay.  Did you find any of those hanging on the wall being
20   used as a hanger in his residence?
21   A.  Yes.
22   Q.  Okay.  So they were actually, in fact, used as a -- what
23   they were said they were used for as being a wall hanger;
24   correct?
25   A.  Yes.  A couple were, yes.
```

1   Q.   Okay.   Now, you've testified on direct examination about

2   this individual, Steve Carrillo; correct?

3   A.   Correct.

4   Q.   And you said that Steve Carrillo I guess as bad actor went

5   out, and there was two different shootings that night he was

6   involved in; correct?

7   A.   That is correct.

8   Q.   And I believe he killed a court security officer and then

9   another officer who came to his house; correct?

10  A.   Yes.

11  Q.   Now, you testified, too, that there was no evidence that

12  Steve Carrillo used a portable wall hanger in any of the

13  firearms that he possessed; correct?

14  A.   That is correct.

15  Q.   Are you aware of whether anyone recovered a portable wall

16  hanger at his residence?

17  A.   I'm not.   It's my understanding that that investigation is

18  still ongoing.

19  Q.   Okay.   Do you have any evidence at all that Tim knew Steven

20  Carrillo?

21  A.   No.   None whatsoever.

22  Q.   Do you have any evidence that Tim communicated with Steven

23  Carrillo?

24  A.   No.

25  Q.   Do you have any evidence whatsoever that Tim supported the

1   actions of Steven Carrillo?

2   A.  Just shipping the drop-in auto sear.  That's all.

3   Q.  Okay.  You found nothing in his computers or his phones or

4   on his social media suggesting that Steven Carrillo should be

5   commended; correct?

6   A.  No, not at this point; but I will say we have not even

7   scratched the surface really on revealing his electronic

8   devices.  There was a lot for us to go through.

9   Q.  Are you aware of whether the Boogaloo movement in general

10   supported Steve Carrillo?

11   A.  I know he was affiliated with them.  I do not have any

12   exact statements where they supported him.

13   Q.  Have you found any Facebook posts, social media posts, or

14   anything on the computer of Tim talking about not supporting

15   violence and not supporting those types of shootings?

16   A.  Again, we're just looking into it; but I believe there was

17   some sort of group that was made up.  And I can't remember the

18   name of it, but it was a group that was affiliated with not

19   committing violent acts.  I wish I could give you more detail

20   on that.  I just -- I don't remember exactly what it was.

21   Q.  All right.  Are you talking about a group that Tim was

22   involved in?

23   A.  It was on -- I can't remember if it was on his device or

24   Emily Cross's device.

25   Q.  Would that have been called Team Panhandle?

1   A.   Yes, I believe it was.

2   Q.   Okay.  And you're aware in that group they had a

3   nonaggression policy; correct?

4   A.   Yes, I did see that.

5   Q.   Okay.  And, again, that was a group that Tim had formed;

6   correct?

7   A.   I don't know that.

8   Q.   Okay.  But the nonaggression policy suggested that the

9   group take no violent actions; correct?

10  A.   That's correct.

11  Q.   And that all violent actions were, in fact, illegitimate;

12  correct?

13  A.   Correct.  I believe so.  I don't --

14  Q.   And is that something that --

15  A.   I don't remember for sure but that sounds right.

16  Q.   Okay.  Is that also something that Emily Cross told you in

17  your debriefing with her that he had this nonaggression policy?

18  A.   She told us about Team Panhandle.  That they would get

19  together.  Where they had in the past gotten together to shoot

20  rifles in the woods.  She didn't say anything about the

21  nonaggression pact.

22  Q.   Okay.  Did she tell you that the Team Panhandle was formed

23  because Tim and others were -- did not like the certain facets

24  of the Boogaloo movement?

25  A.   No.  I believe what she told us was they were formed

1  because they -- they were all formed because of the Boogaloo
2  movement.
3  Q.  They were formed because of it?
4  A.  Yes.  Because of their -- all of their connections to the
5  Boogaloo movement.
6  Q.  Okay.  Did she tell you that she was connected to the
7  Boogaloo movement?
8  A.  Through those forums.  She said that she did not have many
9  girlfriends.  She hung out with the guys a lot.  And it was
10 just something that they were in to.
11 Q.  And do you -- so she described the guys that she hung out
12 with as members of the Boogaloo movement?
13 A.  No.  She said that they -- Team Panhandle was started
14 because the members were affiliated with the ideology of the
15 Boogaloo movement.
16 Q.  Okay.  Now, the idealogy of the Boogaloo movement, you've
17 suggested that their ideology is to incite violence; correct?
18 A.  That is correct.
19 Q.  And isn't it true though that Team Panhandle was explicitly
20 opposed to that ideology, and they -- their principle was not
21 inciting violence; correct?
22 A.  Correct.  It's very contradictive.
23 Q.  Okay.  Isn't it also true that when we're talking about
24 this so-called Boogaloo movement, there's really no centralized
25 definition of what the Boogaloo movement is; correct?

1    A.  Correct.

2    Q.  And it's a general term that can include violent

3    extremists; correct?

4    A.  Correct.

5    Q.  And it can also include people that are just concerned with

6    Second Amendment rights; correct?

7    A.  Correct.

8    Q.  Okay.  And you have no evidence that Tim was in some way

9    associated with -- in terms of being involved with a Boogaloo

10   movement that was racially or ethnically motivated; correct?

11   A.  No.

12   Q.  And your evidence would suggest that he's involved with --

13   more with the Second Amendment rights and that was one of his

14   big principles; correct?

15   A.  I haven't seen anything directly that showed -- other than

16   the fact that he owned weapons, I haven't seen anything that

17   shows me that he was a big supporter of the Second Amendment

18   other than the fact that he owned weapons.

19   Q.  Have you talked to anyone in the Team Panhandle?

20   A.  I have not, no.

21   Q.  Okay.

22   A.  But we were told by Ms. Cross that no one from Team

23   Panhandle, as far as she knew, had ordered a portable wall

24   hanger.

25   Q.  Okay.  Now, you also testified on direct examination about

1    Duncan Lemp; is that correct?

2    A.   Correct.

3    Q.   Okay.   And now Duncan Lemp you said that there was an

4    inclusion of a posting on the portable wall hanger website that

5    suggested that a portion of the proceeds would go to a GoFundMe

6    set up for him; correct?

7    A.   Correct.

8    Q.   Now, you're aware of the -- Duncan Lemp's situation,

9    correct, that -- which led to his shooting?

10   A.   Yes, I am.

11   Q.   And you're aware that it's reported in local newspapers

12   that he may have been asleep when the police conducted a

13   no-knock warrant at his house; correct?

14   A.   I have seen articles like that, yes.

15   Q.   And, again, that's not -- we're not talking about -- these

16   aren't some extremist Boogaloo articles or anything of that

17   nature.   This is mainstream media articles suggesting he may

18   have been asleep; correct?

19   A.   Correct.

20   Q.   Would it be fair to say that you can compare his shooting

21   with what happened with Breonna Taylor that led to a lot of the

22   Black Lives Matters protests?

23   A.   I don't feel comfortable saying that.   I don't know enough

24   about it.

25   Q.   Okay.   But it's fair to say that there's a number of very

1    reasonable people that would be upset about someone getting

2    shot in his sleep by the police; correct?

3    A.   If that were true, yes.

4    Q.   Okay.  And you're aware that the GoFundMe was set up to

5    support his girlfriend and his -- and the legal defense against

6    the police; correct?

7    A.   Correct.

8    Q.   And there's nothing nefarious about that you'd agree;

9    correct?

10   A.   There was a text message sent to a Ms. Cross from

11   Mr. Watson the day after Duncan Lemp was shot.  And Mr. Watson

12   said yesterday at 4:30 A.M. -- I can't remember the name of the

13   county where he was shot, but that the police shot one of his

14   customers.

15   Q.   That they shot one of his customers is what he said?

16   A.   Yes.

17   Q.   Okay.  Do you have any evidence that Duncan Lemp purchased

18   a portable wall hanger?

19   A.   I do not.

20   Q.   Okay.  Now, this -- let me talk to you a little bit about

21   this portable wall hanger website.  Now, you're aware of if

22   someone wanted to sell something illegal, they can do it on the

23   dark web; correct?

24   A.   Absolutely.

25   Q.   I think there's something called the Tor server where they

1    can do it and essentially remain anonymous; correct?

2    A.   Correct.

3    Q.   Tim didn't use the dark web in setting up the portable wall

4    hanger website, did he?

5    A.   No.

6    Q.   And he didn't use a Tor server to hide his identity in

7    setting up that website, did he?

8    A.   No.

9    Q.   Essentially, he opened the portable wall hanger website

10   like you would any other eCommerce website.  Do you agree with

11   that?

12   A.   Yes.

13   Q.   And it's fair to say he created a PayPal account to handle

14   his --

15        (Zoom distortion.)

16   Q.   -- correct?

17   A.   You kind of broke up there, but he had a PayPal account for

18   transactions on the website.  Correct.

19   Q.   Okay.  And in opening up that PayPal account, did he use

20   his real name?

21   A.   Yes.

22   Q.   Did he use his real address, the 302 South Marshall Street

23   address?

24   A.   Yes.

25   Q.   And did he use his actual phone number?

1    A.   Yes.

2    Q.   And did he use his actual date of birth?

3    A.   Yes.

4    Q.   So he wasn't trying to hide anything with that PayPal

5    account; correct?

6    A.   It did not appear so, no.

7    Q.   Are you aware that he registered the portable wall hanger

8    business with the West Virginia Secretary of State?

9    A.   Yes.

10   Q.   Again, he used his actual name in registering it; correct?

11   A.   Correct.

12   Q.   He used his actual address when registering it; correct?

13   A.   Correct.

14   Q.   And I believe he used a Visa card with -- that contained

15   his name to pay for the business registration; correct?

16   A.   I believe that is correct.

17   Q.   Okay.  And you're aware that he also opened up a Stamps.com

18   account --

19   A.   Correct.  Yes.

20   Q.   Okay.  And, again, he used his actual name with that;

21   correct?

22   A.   Yes.

23   Q.   He used his actual address?

24   A.   Yes.

25   Q.   He used his actual phone number?

1    A.   Yep.

2    Q.   And the shipments that he made with the Stamps.com, the

3    return address that was put on there was his return address;

4    correct?

5    A.   That is correct.

6    Q.   He also registered the site with a web-hosting service.   I

7    believe it's We Believe, Incorporated; correct?

8    A.   Correct.

9    Q.   Again, he used all his actual real information when

10   registering this site, correct?

11   A.   That is correct.

12   Q.   So he did all his business with the portable wall hanger

13   website openly you'd agree?

14   A.   No.

15   Q.   Okay.

16   A.   I would not agree.

17   Q.   And is that only because he used the Proton email address?

18   A.   I mean the Proton email -- maybe he's just concerned about

19   security, but Proton email is encrypted end to end.   Law

20   enforcement cannot get contact -- or content to those emails

21   even with a warrant.   But I would say that the business was not

22   on an up and up because it was marketed openly so it would be

23   deniability that he was making drop-in auto sears.

24   Q.   Well, let me ask you this, Agent.   Anyone that looked at

25   the website and was aware of firearms was aware that these

1  portable wall hangers looked like auto sears; correct?

2  A.  I think it's safe to assume that the people that ordered

3  them for that purpose knew that's what they were.

4  Q.  Well, and if an ATF agent looked at the website, they would

5  look at it and say, hey, those things look like auto sears;

6  correct?

7  A.  Yeah, probably.  Yes.

8  Q.  And someone that's very familiar with firearms would look

9  at the website and say, hey, those things look like auto sears;

10  correct?

11  A.  Correct.

12  Q.  So, again, when you say that they're just trying to be

13  hidden for a certain level of deniability, this was out in the

14  open for anyone to see this website.  It wasn't hidden --

15  A.  Correct.

16  Q.  Okay.  Now, you testified about the arrest of Tim and what

17  happened during that arrest; correct?

18  A.  Correct.

19  Q.  And he was arrested -- was he arrested -- it was not at his

20  home.  Was it at a convenience store?

21  A.  Yes.  He had left his home and driven to 7-Eleven.

22  Q.  Okay.  And he didn't resist his arrest in any way; you'd

23  agree with that?

24  A.  Not that I'm aware of, no.  I think he was in custody

25  pretty quickly.

1  Q.  And he didn't act violently towards the officers; correct?

2  A.  No, he did not.

3  Q.  And he did not curse at or otherwise verbally assault the

4  officers, did he?

5  A.  Not that I'm aware of, no.

6  Q.  And he did not threaten the officers in any way?

7  A.  No.  Not to my knowledge.

8  Q.  The only thing he mentioned is that he thought he was being

9  kidnapped; correct?

10  A.  That is correct.

11  Q.  And that's because he thought that what he was doing with

12  the portable wall hangers was legal; correct?

13  A.  I would say it's more like because he thought that it

14  couldn't be proved that it was not legal.  I mean Ms. Cross

15  states that he knows exactly what he was doing.  It was written

16  in her journal.  I mean he knows what he's making.  So I don't

17  think I can attest that he thought what he was doing wasn't

18  legal or that it was legal.

19  Q.  You're aware of the statutory definition of what is a

20  machine gun; correct?

21  A.  I have seen it, yes.  I don't have it in memory.

22  Q.  And would you agree with me that in this case, the way that

23  you're prosecuting Mr. Watson is under the part that says that

24  a machine gun is any part designed and intended solely and

25  exclusively or combination parts designed or intended for use

1  in converting a weapon into a machine gun; correct?

2  A.  Correct.

3  Q.  Now, it's possible that Mr. Watson believed that --

4     (Zoom distortion.)

5  Q.  -- portable wall hanger was not designed solely and

6  exclusively for converting a weapon into a machine gun;

7  correct?

8  A.  No.  That's not correct.

9  Q.  But he did have these things hanging on his wall.  You'd

10  agree with that?

11  A.  Right.  But I can reread the statement from Ms. Cross that

12  says exactly what he knew he was doing.  Verbatim.  That he is

13  -- "It's nothing but a 3D printed drop-in auto sear for

14  firearms.  It is 100 percent illegal in all forms."

15  Q.  Again, that's Ms. Cross's statement.

16  A.  Correct.

17  Q.  It's not Mr. Watson's statement.  Would you agree?

18  A.  That's correct.

19  Q.  And, again, the evidence is that Mr. Watson had created

20  these things with the incorrect geometry that he put into a

21  firearm; correct?

22  A.  No.  That's not correct.

23  Q.  Well, you testified that they had to be modified in some

24  way --

25  A.  That's correct.  That's correct.  But ATF says as they are

1    shipped -- as they are made and as they are shipped, they are

2    machine guns technically.  Each one is a machine gun before

3    it's -- whatever needs to be done to it to get it to fit.

4    Q.  I understand that, but that's the ultimate issue of fact

5    that's going to be decided in this case.  What I'm asking you

6    is that the way that they were created, they were created with

7    a geometry that would not fit into a firearm to make it a

8    machine gun; correct?

9    A.  No.  With a little bit of work, it can be fit into a

10   machine gun.  There's a lot of ways to make a hook.  You can

11   make a hook many ways, but there's only one way to make a

12   drop-in auto sear.

13   Q.  You're aware that a metal clothes hanger can be converted

14   into a drop-in auto sear; correct?

15   A.  I've heard that, yes.  I have not seen that, but I have

16   heard that.

17   Q.  But you've heard it.  So would the creation of a metal

18   clothes hanger be considered creating a machine gun?

19   A.  If it was put into the shape of a drop-in auto sear, yes.

20   Q.  Okay.  Now, Agent, do you have any evidence whatsoever that

21   any of these portable wall hangers were ever used in an act of

22   violence?

23   A.  No.

24   Q.  Now, you testified on direct examination about Mr. Watson

25   making some angry statements about the IRS; correct?

1    A.    Correct.

2    Q.    You have no evidence that he ever planned to carry out

3    anything against the IRS; correct?

4    A.    I do not.

5    Q.    It sounds like someone that was venting his frustration and

6    exaggerating about dealing with the IRS; correct?

7    A.    He was definitely venting his frustrations, yes.

8    Q.    Okay.  And you don't have any evidence whatsoever of -- any

9    electronic evidence that you seized of him trying to plan out

10   any type of violent attack; correct?

11   A.    Correct.  But we have not gone through all that yet.  I

12   just want to be clear.  We have not reviewed everything yet.

13   Q.    Okay.  Now, the firearms that were seized from his

14   residence, you have no evidence that they were ever used in any

15   crime; correct?

16   A.    That's correct.

17   Q.    Okay.  And you have no evidence that they were ever used in

18   any violent acts; correct?

19   A.    That is correct.

20   Q.    And even though -- I think you testified that the one

21   firearm didn't have a serial number on it.  That firearm is

22   not, in fact, illegal; correct?

23   A.    That's correct.

24   Q.    And the firearm that was found on his person, carrying that

25   on his person is not, in fact, illegal; correct?

1    A.   That's correct.

2    Q.   And carrying that knife that was found on his person that's

3    not in fact illegal; correct?

4    A.   That is correct.

5    Q.   Now, obviously all these items that were seized from his

6    residence, you have them in evidence, and Mr. Watson does not

7    have access to them anymore.  You'd agree with that?

8    A.   Yes.  That's correct.

9    Q.   Now, when you testified on direct examination, you said

10   that there was a jail call where Tim told his parents that he

11   wanted to marry Emily right away; correct?

12   A.   That's correct.

13   Q.   And, again, there was no mention of any kind of marital

14   privilege or anything of that nature --

15   A.   There was not.

16   Q.   -- would you agree with that?  And that could have very

17   well been him pronouncing his love for Emily; correct?

18   A.   It could have been, yes.

19   Q.   Okay.  Now, you said that when you reviewed the electronic

20   evidence, you found a number of different manuals or documents

21   on the computer; correct?

22   A.   Correct.

23   Q.   Now would it be fair to say that that was only a small

24   sampling of many different things that he had on his computer?

25   A.   Yes.

1  Q.  Did you see books about electricity, about physics, about

2  many different --

3  A.  I know there were books about mechanical techniques and

4  building things.  I don't -- I'm not a hundred percent sure

5  about the other ones you're talking about, but I know there

6  were some books on mechanics.

7  Q.  Okay.

8  A.  Manuals.  Documents.  I don't know if they were books, but

9  it was all digital.

10  Q.  Now, in your debriefing of Ms. Cross, she never said that

11  Tim acted in any way that was violent; correct?

12  A.  No.  No.  Not to my recollection, no.

13           MR. MCDERMOTT:  I have no further questions at this

14  time, Your Honor.

15           THE COURT:  Any redirect, Mr. Douglas?

16           MR. DOUGLAS:  Briefly, Your Honor.

17           THE COURT:  All right.

18                    RECROSS EXAMINATION

19  BY MR. DOUGLAS:

20  Q.  Agent McNeal, you were asked a set of questions seeming to

21  imply that these are not even auto sears.  Do you remember

22  those questions?

23  A.  Yes.

24  Q.  Okay.  But did this investigation include the review of

25  several electronic communications between Mr. Watson and his

1  prospective customers?

2  A.  Yes.

3  Q.  And are there multiple messages from customers where it's

4  clear they believe they're buying an auto sear?

5  A.  Yes.

6  Q.  For example, did a customer ask how many keys -- and put

7  keys in quotes -- does it roughly take before one breaks?

8  A.  Yes.

9  Q.  Did Mr. Watson say, oh, what are you quoting keys for;

10  these are really wall hangers, man?

11  A.  No.

12  Q.  Okay.  In fact, did he respond that they're heat and impact

13  resistant?

14  A.  Yes.

15  Q.  Okay.  Did another customer say I can't wait to get my car

16  keys to go (descriptive sound) B-R-R-R-R-R-R-R?

17  A.  Yes.

18  Q.  Do you remember that one?

19  A.  Yep.

20  Q.  Did he say (descriptive sound), what do you mean B-R-R-R?

21  These are just wall hooks, man.  I'm trying to get you to hang

22  your coat on the wall.  A set of keys so you can grab them.

23  A.  No, he did not.

24  Q.  Okay.  Do you remember when that one customer said I can't

25  figure out how to, quote, hang it on my wall so I can, quote,

1  grab my keys a lot quicker?  Do you remember that one?

2  A.  Yes.

3  Q.  Did Mr. Watson say, man, why are you putting quotations

4  around my advertisements like that?

5  A.  No.

6  Q.  These are really to hang.  What are you doing that for?

7  A.  No, he did not.

8  Q.  Okay.  Do you remember that set of questions you were asked

9  on cross examination that seemed to be implying this has

10  nothing to do with the Boogaloo?

11  A.  Yes.

12  Q.  Do you even remember that one that was comparing Duncan

13  Lemp to Breonna Taylor?  Do you remember that one?

14  A.  Yes.

15  Q.  Okay.  Do you remember that electronic communication where

16  Watson calls a customer Sir Boogie?

17  A.  Yes.

18  Q.  B-O-O-G-I-E.

19  A.  Yep.

20  Q.  Okay.  Do you remember how multiple of the customers on

21  Instagram had boi, B-O-I, or B-O-I-S in their user names?

22  A.  Yes.

23  Q.  And, in fact, one user name was Duncan Socrates Lemp?

24  A.  Yes.

25  Q.  Do you remember how one customer said the products only

1  worked in ArmaLite roles?  ArmaLite being a gun manufacturer.
2  A.  That's correct.
3  Q.  Do you remember one asking if it worked on a Scorpion wall,
4  a Scorpion being a gun?
5  A.  Correct.
6  Q.  Okay.  Do you remember a set of questions you were asked
7  that seemingly and trying to imply that this was all in the
8  open?  Remember that things were all in the open?  He put his
9  name on things?
10 A.  Yes.  Yes.  That's correct.
11 Q.  Okay.  But he used encrypted emails; right?  In fact, did
12 he also encrypt use of VPN to encrypt his IP address as well?
13 A.  That is correct.
14 Q.  Okay.  Did he invite customers to use false names?
15 A.  Yes.
16 Q.  Okay.  Because you asked, you know, did Duncan Lemp --
17 could you find a record that Duncan Lemp purchased an auto
18 sear?  Do you remember being asked that?
19 A.  Yes.
20 Q.  Would it be helpful if people used their real names --
21 A.  It would.
22 Q.  -- and not invited to use false names?
23 A.  Yes.  And I would like to say that we have not gone through
24 who all received these yet.  We're still in the process of
25 trying to discover that.

1   Q.  Okay.  The last thing I'll ask you about is the arrest.  I

2   think you were asked a little bit about that.  He came out of a

3   convenience store and --

4   A.  Yes.

5   Q.  Did you or other officers actually sit on his house for

6   several hours that day --

7   A.  Yes.

8   Q.  -- waiting for him to leave?

9   A.  Yes.

10  Q.  Like how many hours do you think?

11  A.  Starting from about 6 o'clock, and I believe he was

12  arrested around 2:00 in the afternoon.

13  Q.  Several hours then?

14  A.  Yes.

15  Q.  Why were you waiting for him to leave the residence?

16  A.  Because we were trying to avoid any situation where he

17  would have an opportunity to be violent towards us.

18  Q.  Are you glad you made that decision after you saw all the

19  firearms in the house?

20  A.  Yes.

21  Q.  Are you glad you made that decision after you heard the

22  live-in girlfriend say he said if they come here, it won't be

23  pretty?

24  A.  Yes.

25  Q.  So you're glad you waited until he left the house?

1    A.   Very glad.

2              MR. DOUGLAS:   No further questions.

3              THE COURT:   Mr. McDermott, any recross.

4              MR. MCDERMOTT:   Just briefly, Your Honor.

5                     RECROSS EXAMINATION

6    BY MR. MCDERMOTT:

7    Q.   Now, Agent, all those references to these portable wall

8    hangers being something else, they were made by customers that

9    were buying the portable wall hangers; correct?

10   A.   Yes.   That is correct.

11   Q.   And whenever they made those statements, I believe --

12   except for the one about the keys -- Tim would go back and say,

13   nope, these are meant to be hung on your walls; correct?

14   A.   Correct.

15   Q.   So he did respond to them and say, no, these are meant to

16   be hung on your walls.   He didn't just say nothing.

17   A.   Correct.   He responded back.

18   Q.   Okay.

19   A.   I mean I don't know if he responded back every time, but,

20   yes, there were messages where he responded back saying to hang

21   them here or hang them there.   Yes.

22   Q.   But he never responded back telling them how to modify the

23   geometry to make them work; correct?

24   A.   He did not.

25   Q.   Okay.

1          MR. MCDERMOTT:  Nothing further, Your Honor.

2          MR. DOUGLAS:  Nothing further, Your Honor.  May this

3   witness be excused?

4          THE COURT:  You may step down, sir.

5      (Witness excused.)

6          THE COURT:  Mr. Douglas, where are your original

7   exhibits that you want to have marked?  Are they the ones that

8   you provided to the Court?

9          MR. DOUGLAS:  Yes, Your Honor.

10          THE COURT:  All right.

11          MR. DOUGLAS:  Those will be the ones --

12          THE COURT:  Be sure that those are with the Court.

13     All right, gentlemen, we're going to take just a brief

14   recess before we continue.  So with that in mind, we'll take

15   about ten minutes.  We'll return in about ten minutes.  About

16   ten after four.

17     (Recess 4:00 P.M. – 4:16 P.M.)

18          THE COURT:  Thank you.  Please be seated.

19     All right.  Let's go back on the record, Tara.  We have

20   everybody present.

21     Mr. McDermott, are you still with us?

22          MR. MCDERMOTT:  Yes, Your Honor.  I'm here.

23          THE COURT:  All right.  Excellent.

24     All right, Mr. Douglas, you may proceed, sir.

25          MR. DOUGLAS:  Your Honor, the Government has no

1    further witnesses.

2              THE COURT:  All right.

3              MR. DOUGLAS:  The Government would proffer the

4    contents of the pretrial services report which I would just

5    highlight for the Court that the probation office had a

6    negative assessment of nonappearance and for danger based on

7    substance abuse history, unverified employment, nature of the

8    offense, history involving a firearm.  And we would just

9    emphasize that for the Court, and we would ask for an

10   opportunity to make a legal argument once the defense has made

11   any case they have.

12             THE COURT:  All right.  Thank you, Mr. Douglas.

13      Mr. McDermott, I'll take your response now to the proffer

14   of the pretrial services report.  We do have a representative

15   of the pretrial -- probation office available in the court

16   should you choose to inquire.

17             MR. MCDERMOTT:  Thank you, Your Honor.  And I think I

18   can address probably some of those issues, but I know that some

19   of them were addressed in the bond motion that we filed.  And

20   it's probably best to just address them in argument when we get

21   to it.

22             THE COURT:  All right.  That will be fine then.

23      Anything further from the Government?

24             MR. DOUGLAS:  No, Your Honor.

25             THE COURT:  All right, Mr. McDermott, do you have any

1   witnesses or evidence that you'd like to present at this time,

2   sir?

3           MR. MCDERMOTT:  I believe so, Your Honor.  I'd like

4   to call John Watson, the defendant's father, to the stand if

5   he's there.

6           THE COURT:  All right.  Mr. Watson, if you're present

7   in the courtroom, step forward.

8       (The witness was sworn in.)

9           THE WITNESS:  I do.

10          THE CLERK:  Have a seat.

11          THE WITNESS:  Good afternoon, Your Honor.

12          THE COURT:  Good afternoon, sir.

13                      DIRECT EXAMINATION

14  BY MR. MCDERMOTT:

15  Q.  Mr. Watson, can you -- just make sure to speak loudly and

16  clearly into the microphone.  Okay?

17  A.  Yes, sir.

18  Q.  Okay.  And can you please state your name -- your full name

19  for the court reporter.

20  A.  My name is John Joseph Watson.

21  Q.  And where do you currently reside, sir?

22  A.  3696 Lower Arkansas Road, Baker, West Virginia 26801.

23  Q.  And what is your relationship to Tim, the defendant in this

24  case?

25  A.  Tim is my son.

1  Q.  Now, you and Tim's mother, Tammie, are married; correct?

2  A.  Yes, sir.

3  Q.  How long have you been married?

4  A.  I think you asked how long I was married.  We've been

5  married 37 years.

6  Q.  And are you both currently retired?

7  A.  Yes, we are.

8  Q.  What did you and Tammie do before you retired?

9  A.  I was an auto mechanic shop foreman for 38 years for,

10 first, Tischer Volkswagon for 23, and then the rest of my

11 career with Fitzgerald Auto Mall in Frederick.

12 Q.  Okay.  Now, sir, I'd like for you to describe a little bit

13 to this Court about your family.  So how many children do you

14 have?

15 A.  We have two boys.  Tim and his younger brother Michael.

16 Q.  Okay.  And where is your other son Michael?

17 A.  Michael lives in Asheville, North Carolina.

18 Q.  And is he the one that's currently in drug rehabilitation?

19 A.  Well, no longer.  He was in drug rehabilitation, but he has

20 successfully -- well, you never successfully beat it, but he is

21 fighting hard and is clean from heroin abuse.

22 Q.  Okay.  Now, do you consider yourself a close-knit family?

23 A.  Yes, sir, I do.

24 Q.  Okay.  Where was Tim born?

25 A.  Tim was born in PG County on a small farm that we had in

1  1990.

2  Q.  And did you guys move somewhere when Tim turned around six

3  years old?

4  A.  Yes.  In 2006 we moved to Myersville, Maryland.  A small,

5  little town community outside of Frederick, Maryland.

6  Q.  And what was the reason for moving to Myersville?

7  A.  We moved to Myersville to -- for our boys to have more of a

8  rural community environment to grow up in.

9  Q.  And how long was your family in Myersville for?

10  A.  We were in Myersville 22 years, sir.

11  Q.  Okay.  Now, sir, can you tell a little bit to the Court

12  what Tim was like as a child?

13  A.  From a very small age, Tim was a very talented young man.

14  He loved music.  He loved the outdoors.  He always loved

15  creating his own toys with things around the house.  He always

16  enjoyed -- me being an auto mechanic, my son would always look

17  forward to me bringing something -- an alternator or turbo or

18  transmission parts -- home that we can go into the garage.  Tim

19  would always want to know how they worked.  What made them

20  work.  A very inquisitive, playful young man.

21  Q.  And can you explain to the Court a little bit about Tim's

22  relationship with some of your elderly neighbors in Myersville?

23  A.  Yes.  In our -- well, I don't necessarily even call it a

24  neighborhood.  Everyone -- it was a very rural area.  But Tim

25  would help anyone that needed it.  There was one gentleman that

1  was his favorite in particular.  His name is Anthony Wolfe.

2  Everyone called him Mr. Tony.  He was an older man.  Heavily

3  involved in a Catholic church.  And he would oftentimes ask Tim

4  if he could volunteer his time to help with some of the people

5  in the community that aren't quite as fortunate as others.  Tim

6  spent countless hours and days splitting firewood with Mr. Tony

7  for those families who didn't have enough heating oil to get

8  through the winter.  Tim would mow grass during the summer if

9  it was too hot for the elderly to get out there and do this.

10  Small home repairs.  Small home repairs because Tim

11  (indiscernible) carpenters, but they would try to fix windows,

12  leaky doors, clean gutters.  Anything that Mr. Tony needed, Tim

13  would always stop and help.

14  Q.  Now, is that attribute that your son has for caring for

15  others, is that still a big part of his personality?

16  A.  I'm sorry.  I'm having a -- could you --

17          THE COURT:  Mr. McDermott, you may need to repeat the

18  question for us, please.

19          MR. MCDERMOTT:  Certainly.

20  BY MR. MCDERMOTT:

21  Q.  That attribute that you described of your son of caring for

22  others at a young age, is that still a big part of his

23  personality?

24  A.  Oh, absolutely.  Tim has always been the person that stands

25  and holds the door while people come in even though it's in the

```
 1   rain.  On multiple occasions Tim has stopped when somebody is
 2   sitting on the side of the road with their flashers on just to
 3   see if they need assistance.  There's one particular situation
 4   that I was very proud of.  My son was on his way home from work
 5   one winter evening.  We have a lot of back roads through the
 6   mountains where we lived.  Tim kind of saw something out of the
 7   norm on the side of the road.  And instead of what most people
 8   would do and just continue home, he decided to stop.  Walked
 9   over to the edge.  And sure enough there was a vehicle that had
10   gone over a small embankment and was flipped upside down.
11       My son ran to the vehicle.  Found a gentleman inside.
12   Assured the gentleman he would get assistance to help the
13   gentleman.  My son had to run to get cell service because we
14   don't have much cell service back in these back roads.  Called
15   911.  Got back to the vehicle and stayed there with the
16   gentleman until 911 arrived to assure the gentleman that he
17   would be okay.  Not knowing whether the car would catch on fire
18   or not, my son was just more concerned about making the man
19   calm and safe and comfortable.
20   Q.  Now, since that incident, is one of the things your son
21   does to this day is carry around a medical kit in his vehicle
22   in case he comes upon any emergency?
23   A.  Yes.  Since that time -- as a matter of fact, it's a
24   medical kit that I gave him.  He actually carries it in his car
25   because he realizes how much they can come -- and none of us
```

1  know until you see the situation where bandages or anything may

2  be needed; but, yes, he carries it in his vehicle at all times.

3  Q.  Now, can you just describe a little bit and tell the Court

4  a little bit about Tim's educational background?

5  A.  Tim went to Myersville Elementary.  Then he went to

6  Middletown Middle School and Middletown High School.  Two

7  months prior to graduation, Tim and his guidance counselor had

8  determined that he would be a few credits short of graduating.

9  So he discussed with the guidance counselor and then came home

10 and discussed with us how we felt that if he were to withdraw

11 from high school and go get his GED.  We felt that as long as

12 he got his high school diploma, we would stand behind him.  Tim

13 immediately, you know, the following day applied to take the

14 GED test which takes several weeks to get it all applied.  Tim

15 withdrew from school, went down and took his GED test, passed

16 it with flying colors, and has never looked back.  Has always

17 continued to self-educate himself.

18 Q.  Now, sir, I shared with the Court in a filing previously a

19 letter from a Ms. Peggy Throne.  Could you describe to the

20 Court a little bit about Tim's relationship with Peggy Throne?

21 A.  Yes.  Peggy Throne was always -- well, she is a great

22 woman.  She's retired.  Peggy Throne was Tim's guidance

23 counselor through middle school and high school.  Luckily she

24 happened to transfer as the classes went through.

25     Tim was always that child.  Never a problem in school but

1   always -- he learns very quickly.  He likes a fast-paced

2   environment, and sometimes he would get bored with school.

3   Peggy Throne was someone that always knew what Tim was and how

4   Tim was.  Tim talked with her on several occasions.  Peggy

5   Throne always advocated for Tim.  She was always there for Tim.

6   And to this day, they still keep in contact via Facebook or --

7   I'm not a computer person, but they're still in touch even out

8   through the years.

9   Q.  And let me ask you this, sir.  Now, is Tim someone who has

10  always been gainfully employed?

11  A.  Yes.  Tim started working at the age of 15 because he knew

12  that his mother and I -- we feel that, you know, you have to

13  work to keep your own.  He started working at 15.  So we would

14  match any money he saved for a car.  He had to continue working

15  if he wanted to drive to pay the insurance.  So Tim has always

16  been employed, yes.

17  Q.  And can you just tell the Court just generally what Tim has

18  done in terms of his employment?

19  A.  Oh, let's see.  Tim was a prep chef at a golf course, a

20  local golf course.  He then worked at Fitzgerald Auto Mall for

21  a few years as a car (indiscernible) and then advanced to a

22  service advisor.  He worked for the power company for about a

23  year.  He worked for a tech phone company called Spirent for

24  about two years or so I believe.  And his last job was working

25  at the Knights Inn prior to being laid off due to the COVID

1  pandemic.

2  Q.  Okay.  Now, if released on bail, do you think that Tim

3  would be willing and would go out and find employment?

4  A.  Absolutely.  If the Court would allow Tim, yes.  I think

5  Tim feels it's his responsibility to take care of himself.  Not

6  to ride on somebody's coattails.

7  Q.  Okay.  Now, I understand from talking with you that the

8  opioid epidemic has hurt your family like it has so many

9  families across this country.  Can you explain to the Court a

10 little bit of how Tim has tried to help different family

11 members and friends that have been affected by the opioid

12 epidemic?

13 A.  Yes.  Tim watched his younger brother deal with the heroin

14 epidemic.  He has successfully been through treatment but also

15 his cousin, my sister's only son, was also stricken with the

16 disease, with heroin addiction.  Tim on multiple occasions -- I

17 worked and my wife could not always be everywhere at one place.

18 Tim would volunteer to take his brother and also his cousin to

19 out-treatment centers for them to get treatment.

20     My son finally got into a full-time treatment center in

21 North Carolina which was four years ago, but he still lives

22 there.  That's where he's employed.  But my nephew came to live

23 with us for about a month while we were trying to get him into

24 a full-time treatment center just to get him away from his

25 environment.  Tim spent countless hours and days talking with

1  our nephew, Jason.  Playing music.  Just trying to make him

2  understand that life is too precious to waste on an addiction.

3  Tim cared very deeply for him.  And unfortunately in 19 -- or

4  I'm sorry, 2015, three days before Christmas, we lost our

5  nephew to the addiction.  It devastated all of us.  Tim took

6  that heartbreak -- because I had said earlier that he loves

7  music and is a talented guitar player -- and wrote a song to

8  play at my nephew's service.  Mainly for the purpose to give my

9  sister and her husband maybe some little ray of sunshine in the

10 most tragic time of their life.

11 Q.  Now, sir, you've heard how the Government has tried to

12 describe your son here today.  But have you ever seen your son

13 act violently in any way?

14 A.  No.  My -- no, I've never seen my son act violently.  And,

15 Your Honor, I can assure you my wife and I would not be here

16 today if we felt in any way that my son was a threat to anyone.

17 And he knows that.  We're a strong-knit family.  I love my son.

18 But we do not put up with violence, and I've never seen my son

19 raise a hand to anyone ever.

20 Q.  And, sir, have you ever heard your son advocate for

21 violence?

22 A.  Never.  No.  Just quite the contrary.  I mean my son -- I

23 heard -- and I'm not a computer guy.  I heard -- you know, my

24 son has a small group that he talks with that has a

25 non-aggressive, non-violent rules -- set of rules.  And my son

1    lives by that.  My son is a good man.  He's not the man he's

2    being portrayed as.

3    Q.  And, sir, you're aware that your son has certain

4    libertarian views and believes in the U.S. Constitution and the

5    Second Amendment; correct?

6    A.  Yes.  Yes.  My son believes strongly in the constitution.

7    My son is a good American.  He's a good U.S. citizen.

8    Q.  Have you ever heard him advocate though for the violent

9    overthrow of the Government or anything like that?

10   A.  Never.  Never.

11   Q.  And is it fair to say that you see your son pretty often;

12   correct?

13   A.  Yes.  My son makes the hour and a half drive at least

14   three, four -- maybe two or three or four times a month to come

15   to the house to speak with my wife, myself, my mother-in-law.

16   She's elderly.  She lives with us.  We have to take care of

17   her.  But, yes, we're an open family.  We discuss -- we may not

18   always agree, but we're never afraid -- my boys are never

19   afraid to discuss anything with us.

20   Q.  And in terms of those discussions, you never heard him

21   discuss any kind of violent idealogy; correct?

22   A.  Absolutely.  Never.

23   Q.  Now, you've had a chance to talk with Tim since he's been

24   arrested; correct?

25   A.  Yes.  We try to speak with him every morning.  We have 15

1  minutes every morning.

2  Q.  And is one of the things that he's told you is expressing

3  remorse for putting you and his mother and his family through

4  this?

5  A.  Yes.  My son is actually in tears every morning apologizing

6  to my wife and I for the situation that we're in.  My son means

7  no harm to anyone, and my wife and I literally have to beg him

8  to please be strong for himself.  That his mother and I have

9  each other to hold on to.  We just want him to be strong for

10  himself.  He doesn't belong where he's at.

11  Q.  Now, if Tim is released -- if the judge decides to release

12  him pending trial, do you believe that he will appear in court

13  as required?

14  A.  Oh, absolutely.  My son will follow every rule and

15  guideline set by this Court.  Absolutely.

16  Q.  And do you believe if he's released pending trial, would he

17  pose a danger to anyone?

18  A.  Absolutely not.  Like I said, I would not be sitting in

19  this chair today if I felt my son was a threat to anyone.

20  Q.  And do you believe that he'll be able to abide by any

21  conditions set for him by the Court?

22  A.  Yes.  He's an upstanding young man.  He will follow every

23  guideline set.  I assure you.

24  Q.  And would you also be willing to allow your son to reside

25  at your residence while on pretrial release and home

1   confinement?

2   A.  Yes.  We've already made arrangements for that for my son

3   to come home and stay with us.  I'm just going to say this for

4   the Court.  That I was a hunter so all weapons, ammunition,

5   everything has been removed from our house in preparation if

6   the Court so allows our son to come home.  That there's a safe

7   place for him to stay, yes.

8   Q.  Okay.  And so I was going to ask you about that.  In terms

9   of he grew up around firearms and hunting with you; correct?

10  A.  Yes.  My son from a very young age was taught gun safety,

11  the care of a gun, the dangers of a weapon, and my son respects

12  those rules.

13  Q.  And now let me ask you this.  And, again, you have no

14  problem with removing the firearms and not going hunting or

15  doing anything of the sort if he's going to be living there

16  with you; correct?

17  A.  They are already removed.  I removed every weapon, every

18  piece of ammunition from our home.

19  Q.  And, sir, I think we've talked a little bit about the

20  concept of a third-party custodian.  Would you be willing to

21  supervise your son's release and report to the Court any

22  violations that he may have?

23  A.  Absolutely.  My wife and I are upstanding, and we know our

24  son is a good man.  But, yes, we will follow every rule that's

25  set forth.

1   Q.  Okay.  And isn't it also true, sir, that you would be

2   willing to put up your property and your home as collateral to

3   secure your son's release?

4   A.  Yes.  Yes, we would.  We have no fear of our son not

5   appearing for court.  We will put up everything that we've

6   worked for.

7   Q.  And, again, this is a property where you are now retired,

8   and you're not a wealthy person; correct?

9   A.  No.  We're not wealthy.  We're just standard working folks,

10  but we are willing to -- we have everything that we've worked

11  for our whole lives in our retirement home.  And, yes, we are

12  willing to put that up to show that our son will appear and

13  follow every rule.

14  Q.  And that's how sure you are that he can follow the

15  conditions of bond; correct?

16  A.  I have -- there's not a doubt in my mind.

17  Q.  Okay, sir.  I have no further questions.  The Government

18  might have some questions for you though.  Okay?

19  A.  Okay.  Sure.

20          THE COURT:  Mr. Douglas.

21          MR. DOUGLAS:  Your Honor, the Government has no

22  questions.

23          THE COURT:  All right.  No questions.  You may step

24  down, sir.

25          THE WITNESS:  Thank you, Your Honor.

```
 1      (Witness excused.)
 2            THE COURT:  Mr. McDermott, do you have any additional
 3   witnesses or evidence that you would like to present at this
 4   time?
 5            MR. MCDERMOTT:  Yes, Your Honor.  I'd like to call
 6   the defendant's mother Tammie Watson to the stand.
 7            THE COURT:  Ms. Watson, if you would step forward,
 8   please.
 9      (The witness was sworn in.)
10            THE WITNESS:  I do.
11            THE COURT:  Hold on for just a moment, ma'am.
12      Mr. McDermott.
13                       DIRECT EXAMINATION
14   BY MR. MCDERMOTT:
15   Q.  Good afternoon, Ms. Watson.  Can you just state your
16   name -- full name for the court reporter.
17   A.  My full name is Tammie Lee Watson.
18   Q.  And you are Tim's mother; correct?
19   A.  Yes, I am.
20   Q.  And you currently reside with your husband at that address
21   in Hardy County; correct?
22   A.  Yes, I do.
23   Q.  Now, you've heard the testimony of your husband here today;
24   correct?
25   A.  Yes, I have.
```

1  Q.   Now, would you affirm everything that your husband has said
2  about your son?
3  A.   Yes, I would.
4  Q.   And would you affirm everything your husband said about
5  what you guys are willing to do to assure his compliance with
6  any bond?
7  A.   Yes, I do affirm all of that.
8  Q.   Okay, ma'am.  Now, if you had to describe your son in only
9  a few words, how would you describe your son?
10  A.   Well, I'd say two words.  Humble and kind.  That's how I
11  raised my boys.
12  Q.   And why is that?
13  A.   Just his character.  Just his compassion.  His need to help
14  people when they need it.  He has this ability to see people
15  that are in need, and he just feels like he has to help.
16  Q.   Now, ma'am, I know your husband talked about your son being
17  a talented musician, and I know the Government has talked a lot
18  about the guns that he had.  But didn't he also have another
19  piece of property that he was very possessive of and that was
20  his guitar?
21  A.   Oh, yes.  Yes.  Yes.  Oftentimes I'd say that Tim has five
22  appendages: two arms, two legs, and a guitar.  He --
23  Q.   Would he play for strangers --
24      (Zoom distortion.)
25  Q.   -- park?

1    A.   Oh, we had a Ruritan park not too far from the house.   And

2    after school, he would go and sit on the picnic table.   And

3    before you know it, people would -- kids would start coming out

4    and even their parents.   And I think that that endeared him.

5    The parents of the children would even come and listen to Tim

6    while he was playing.   And he got a very big -- it was

7    heartwarming for him to know that other people wanted to hear

8    him and his expression of music.

9    Q.   Now, ma'am, you've -- again, he's continued to play that

10   guitar up until the present day; correct?

11   A.   Yes, he does.   Yes.

12   Q.   And you've listened to his songs and attended his concerts;

13   correct?

14   A.   Yes.   And I have quite a few CDs from him as well.

15   Q.   And are his songs about the violent overthrow of the

16   government or anything of the sort?

17   A.   No.   Quite the contrary.   They're uplifting.   Talking about

18   how the world is a crazy place, but we can all get together and

19   get along.   You should hear some of the lyrics.   It would be

20   telling of who he really is.

21   Q.   And his band name is called Effusive; correct?

22   A.   Yes.   Correct.

23   Q.   And their songs are about trying to love everyone; correct?

24   A.   Yes, they are.

25   Q.   Okay.   Now, you've had the occasion to talk to your son

1  from the jail on the telephone as well; correct?

2  A.  Yes, I have.

3  Q.  And is the first thing that he talks about with you on the

4  phone how sorry he is for what he's putting you through?

5  A.  Yes.  Yes.  He -- every day.  I mean that's the first thing

6  that comes out of his mouth just about every day is how sorry

7  he is.  He's being portrayed to be this, and he's just sorry

8  that we have to go through it with him because we are so tight

9  knit.

10  Q.  Now, do you think that if he's given bond release that he

11  would do anything to jeopardize that and hurt you guys any more

12  than he already has?

13  A.  Absolutely not.  No.

14  Q.  Okay.  Thank you, ma'am.  I don't have any further

15  questions.

16  A.  All right.  Thank you.

17          MR. DOUGLAS:  No questions by the Government, Your

18  Honor.

19          THE COURT:  All right.  You may step down, ma'am.

20  Thank you.

21          THE WITNESS:  Okay.  Thank you, Your Honor.

22     (Witness excused.)

23          THE COURT:  All right.  Mr. McDermott, any additional

24  witnesses or evidence that you'd like to present?

25          MR. MCDERMOTT:  I don't have any other witnesses and,

1    of course, the Court has the character letters that I filed

2    with the bond motion in this case.  And there was also the

3    justification of surety that was filed and the nonaggression

4    principle as well that was discussed on direct exam with the

5    agent.  So that's the evidence that we're relying upon for this

6    hearing, Judge.

7            THE COURT:  All right.  Thank you.  All right.  The

8    parties have both requested some time for argument.

9        Mr. Douglas.

10           MR. DOUGLAS:  Yes, Your Honor.  Your Honor, there's

11   no condition or combination of conditions that can change a

12   person's state of mind.  We can take away his guns.  We can put

13   him in a different residence, but no combination of conditions

14   can change a person's mind and their state of mind.  And he is

15   dangerous.

16       Kill them.  I'm going to kill them.  Blow up the building.

17   I'm going to be a crazed gunman.  People need to fucking die.

18   Techniques of silent killing.  A firearm that says the Biden

19   Express.  It won't be pretty if they come here -- law

20   enforcement.  What happens if he doesn't show up, and the law

21   enforcement has to go try to get him?  He said it won't be

22   pretty.  He even said after being shown the arrest warrant that

23   he's been kidnapped.  This is not a state of mind that can be

24   protect -- that can protect the community with some set of

25   conditions.

1      I respect his parents for taking the stand.  Obviously on

2    their son's behalf.  But I would note both of them said that

3    he's being portrayed -- portrayed.  We're talking about his own

4    statements and what people have said he said.  Things that are

5    on his computer.  Things that are in a written journal.  Things

6    that are on a video recording.  We're not making this up.

7      And I thought it was telling -- of course the other

8    statements in Ms. Cross's journal were very interesting, but

9    what was also interesting is how she said, "What happened to

10   the Tim I used to know?"  So we hear from his parents about how

11   he was, but what happened to the Tim I used to know?  This is

12   someone who lived with him every day in this small little

13   apartment when he's in there printing these auto sears.

14     So, Your Honor, we would argue that we have met our burden

15   and showed that no set of conditions can ensure the safety of

16   the community, and we'd ask that he be detained.

17             THE COURT:  Just for clarification --

18             MR. DOUGLAS:  Yes, Your Honor.

19             THE COURT:  -- Mr. Douglas, the presumption does not

20   apply in this place; is that correct -- in this case?

21             MR. DOUGLAS:  The presumption does not apply.

22             THE COURT:  All right.  I just wanted to make sure we

23   had that on the record.  Thank you.

24             MR. DOUGLAS:  Yes, Your Honor.

25             THE COURT:  Mr. McDermott.

1          MR. MCDERMOTT:  Thank you, Your Honor.  And may it

2     please the Court.  And what I would like to say here today is

3     that Tim Watson may be many things, but a violent extremist is

4     not one of them.  And what I would say is he's a staunch

5     believer in liberty.  That's true.  He's a person that holds a

6     high regard for the U.S. Constitution.  That's true.  And he

7     may be an advocate for the -- and very vocal about his right

8     to -- his Second Amendment rights.

9          However, what one -- what makes one an extremist is the

10     willingness to cause harm to others in furtherance of those

11     beliefs.  And what I can tell Your Honor is that Tim, he's not

12     willing to infringe upon other's rights.  He's not.  Unlike an

13     extremist, he's not willing to harm anyone else or use

14     violence; and unlike an extremist, he's not solely defined by

15     his political beliefs.

16          Now, again, the Government can talk about his state of mind

17     and certain offhand comments that he may have made to his

18     long-term girlfriend, but they don't have evidence of him

19     planning any type of extremist action.  You would have heard

20     that here today if there was any evidence of that, and there

21     wasn't, Your Honor.  What you have is in his girlfriend's

22     journal talking about how he sometimes gets excited and says

23     certain things.  That's not anything that he intends to do.

24     That's not his actual state of mind.

25          Tim is someone -- more than anything, more than he's

```
 1  defined by his love of the constitution, he's defined by
 2  someone who deeply cares and loves his family, his girlfriend,
 3  his community, and humanity, Judge.  And what I would ask this
 4  Court to do is reject this evil Boogaloo man that the
 5  Government is trying to create and recognize that Tim would
 6  never violate his bond.  He would never hurt anyone else and
 7  never hurt his family more than he's already hurt them by being
 8  in this case.
 9      And, Judge, the Government says that there's no conditions
10  that may reasonably assure his appearance or the safety of the
11  community; but I can tell you, Judge, and we propose a
12  five-point plan for Your Honor to consider in releasing
13  Mr. Watson on bond.  And I'd suggest that all those conditions
14  can very reasonably assure the safety of the community.
15      And the first part I think is the biggest part, Judge.  Is
16  that his family -- you heard his mother and father here
17  today -- are willing to put up their property.  Their property
18  that they've worked so hard for, 40 years or more of working,
19  to get their retirement property.  That's where they live.
20  Where they plan to live out their lives.  And they're willing
21  to put that on the line for Tim's compliance with his bond
22  condition.  There is no way that that man sitting before you
23  today, Mr. Watson, would do anything -- whatever else you may
24  believe about him, there's no way he would do anything to
25  jeopardize his parents any further.
```

1     And, Judge, I think with that condition, you can get a

2   reasonable assurance that he's not going to violate bond, and

3   he's going to show up as required.  And I can tell you, Judge,

4   that when I met with Mr. Watson before I had this quarantine

5   put upon me, and I met with him at the jail, his first concern

6   was always his family and his parents.  I saw him break down

7   crying not when we're discussing the case, but when we had to

8   discuss the fact that his parents had to hire counsel for him

9   and that he had to put his parents through that.  He started

10  crying realizing that he caused that for his parents, and he

11  couldn't believe that he had to put his parents through that.

12  This is not a man that would go out and do anything to risk

13  that.  To hurt his parents in any other way than they've

14  already been hurt.

15     Now, the other thing, Judge, I'd suggest as part of the

16  five-point plan, the second point is that he can be placed upon

17  home confinement with GPS monitoring at his parents' residence

18  in the Northern District of West Virginia in Hardy County.

19  And, again, Judge, that would assure that he's complying as

20  required.  He's not going out.  He's not meeting with anyone.

21  He's staying at his parents' residence other than medical

22  appointments or going to see his attorney, Judge.  And, again,

23  that can ensure his compliance with any bond conditions.

24     And part of that five-point plan, Your Honor, would be that

25  he not be allowed to use the internet.  He not be allowed to

1   use a smart phone.  And I think the smart phone is covered

2   because out there, I don't think they even have a reception

3   signal.  But they would be more than willing to remove any

4   internet, any computer, any other device from their home so

5   that he could reside there.  And, Judge, really any of the

6   evidence against him in this case is all internet connected.

7   It's any -- and the connections that he has are people on the

8   internet.  As a part of his bond, Your Honor, he would not be

9   allowed to go on the internet and not do any of those things.

10  And I think that can assure that nothing bad would happen if

11  he's released on bond.

12      The other thing, Judge, you heard his father talk about is

13  all the firearms have been removed from the home.  They have

14  already been removed from the home.  So if he's going to be

15  able to reside there, it's going to be --

16      (Zoom distortion.)

17          MR. MCDERMOTT:  There's not going to be any issue

18  with a probation officer coming to the home and being in

19  danger.  And of course the other thing, Judge, that I

20  mentioned, the five-point plan, is that his parents would be

21  third-party custodians.  They would report if their son is

22  doing anything wrong.  And I think, you know, you can get a

23  sense from them testifying here today that they're salt of the

24  earth people, Judge, and that they would be more than willing

25  to report if they thought their son was going to do anything

1  wrong.

2      So, Judge, I think when you look at those five conditions

3  and any other reasonable conditions Your Honor might impose, I

4  think that's enough to ensure the safety of the community.

5      And, Judge, you know, the other thing that you have to look

6  at in this case of course is the strength of the Government's

7  evidence and the weight of the evidence in this case, Judge.

8  And one of the things I want to discuss is first of all, the

9  constitutional significance of this case.  And I'm not talking

10  about -- the case obviously has Second Amendment implications,

11  Judge, about, you know, firearms and what is and what is not a

12  firearm.  But really to me when I look at this case, I think

13  the most important amendment right that we're dealing with,

14  Judge, is the First Amendment right.  The freedom of

15  expression.  And that's really what's being implicated here.

16  And, Judge, I'd suggest to you that that First Amendment right

17  is twofold.  And Tim, you know, I'll state has fervently

18  advocated under the First Amendment for Second Amendment

19  rights.  He's a strong believer in Second Amendment rights.

20  Not strong enough that he wouldn't give up his firearms that if

21  it meant going home to his family, but he has in the past

22  strongly advocated for Second Amendment rights.

23      Now, Judge, again, you heard evidence today about the

24  portable wall hanger website.  That was an offshoot of his

25  first website which was a Second Amendment charms website

1   where, again, it was different jewelry, different knickknacks
2   that were designed with gun parts or to look like gun parts.
3   And this, again, this portable wall hanger idea, Judge, it's
4   not designed to get auto sears into the hands of violent
5   extremists, Judge.  It's designed to show the ridiculousness,
6   at least in my client's mind, of the American gun control
7   policies, Judge.  It's designed to show the ridiculousness that
8   a wall hanger that can be used to hang keys, to hang clothing,
9   can be classified as a machine gun under the law.  And, Judge,
10  again, this is important.  He didn't just go out there and sell
11  these things as auto sears.  He went out and created a portable
12  wall hanger that did not have the dimensions to be put into a
13  firearm.  The only way that these things can be made to
14  actually work as an auto sear would be for the end user to
15  figure out on their own and go about modifying them to be put
16  into a firearm.  The way that they were designed and shipped to
17  people, they did not have the right geometric shape and size to
18  be put in a firearm, Judge, and I think that's important.
19  That's what we're dealing with is going to be the crux of the
20  entire case against my client.  Whether that fits the
21  definition -- whether that fits the definition of a part that's
22  solely and exclusively designed to be made into a -- to convert
23  a weapon into an automatic weapon.
24       But, Judge, really, again, when he was making these things
25  that could be seen as a form of political protest.  He was not

1   making them to be given to the Boogaloo in any kind of
2   underhanded way.  He could have gone on Tor.  He could have
3   gone on the black web and done this all without his name
4   getting out there.  But, Judge, it's important that everything
5   he did was done openly.  He went and registered his business
6   with the West Virginia Secretary of State, Judge.  With his
7   name, his address, and his phone number on there.  He wasn't
8   trying to hide from what he was doing.  He believed what he was
9   doing was legal, and he believed what he was doing was not
10   selling a part that could be considered a machine gun.
11      And, Judge, again, going back to the First Amendment
12   implications, the second part of this case where I think
13   there's a huge First Amendment concern and the First Amendment
14   has to be talked about is when we're dealing with the
15   Government who is making an argument for detention based upon
16   some of Tim's political views.  He has libertarian views, but
17   those views are protected by free speech, Judge, and free
18   expression; and none of his views are outside of that
19   protection.
20      Judge, again, as the agent testified and was attached to
21   the bond motion in this case as Your Honor has read, he had
22   what's known as a nonaggression principle.  That the people in
23   his group, this Team Panhandle that the agent said that he was
24   aware of, all had to agree to abide by.  And the principle was
25   that aggression is inherently illegitimate.  They do not incite

1   violence, they do not initiate application of force, and they

2   do not act in any violent, offensive way at all.  This was an

3   advocacy group, Judge.  This was a political group.  It was not

4   a violent extremist group.  And, again, I think it's important

5   because the First Amendment protects what he was doing there

6   with that group.  The First Amendment protects him.  And the

7   way that the Government is trying to portray him here today,

8   he's not a violent extremist, Judge.  He was exercising his

9   First Amendment rights in associating with that group.

10      Now, Judge, again, you know, removing this case even from

11  the constitutional issues, Your Honor has to look at the fact

12  that these portable wall hangers, you know, first of all, they

13  have to be taken off of their base if they want to be used in a

14  firearm.  Then they have to be modified in some way that the

15  agent wasn't aware of to turn them into a machine gun.  And,

16  Judge, again, I've told you what the definition of a machine

17  gun is.  I could -- I'll proffer to the Court that there's

18  going to be a big issue and a colorable issue about whether

19  these parts as they were shipped -- no matter what the ATF has

20  said -- whether these parts can be considered to be machine gun

21  parts, Judge.  And that's just the way it is.  The way that the

22  definition is and the way these parts are designed, there is a

23  colorable issue that's going to be at trial.

24      So I think when you look at the weight of the evidence

25  against Tim in this case, I think that the weight of the

1   evidence that the Government has right now is weak, Judge.

2   And, Your Honor, the only other thing I'd mention about the

3   weight of the evidence, I know that Tim has been charged with a

4   conspiracy, and we've gone over that conspiracy count in the

5   indictment.  I've seen it.  I've read that conspiracy count in

6   the indictment.  But, again, you know, you can throw out the

7   Boogaloo monitor -- moniker all you want.  But if you go and

8   look in there, it doesn't suggest that there's any

9   co-conspirator.  The co-conspirator that's alleged in the

10  indictment is the person that Tim doesn't know that would have

11  bought the portable wall hanger, Judge.  This is not a case of

12  a conspiracy where there's co-conspirators, there's a big

13  conspiratorial organization.  If anything, the conspiracy that

14  the Government has alleged is a buyer/seller relationship which

15  I think is prohibited by the law.  But for the purposes of

16  bond, Judge, this is not someone that has connections to any

17  Boogaloo movement, whatever that movement is, Judge.  This is

18  someone that was in the Team Panhandle local group and does not

19  have connections other than what he connected with on Facebook

20  groups on the internet, Judge.

21      So, again, and I think if you remove that part, if you

22  remove the internet from him and don't allow him to go on the

23  internet that would assure that he won't be able to connect

24  with any of those persons -- anonymous persons that are in this

25  so-called Boogaloo group.  And, Judge, again, I would suggest

1  to Your Honor -- and you're getting two very different

2  pictures.  Pictures of how his parents describe him and

3  pictures of how the Government describes him.  But I would

4  suggest to you that his parents' picture that they're painting

5  of Tim is the actual Tim Watson.  He's humble, kind, and

6  genuinely cares about his fellow human beings no matter their

7  race, gender, or political identity.

8       This is important, Judge, and I asked his -- it's not just

9  fluff when I asked his mom about his band, his band Effusive.

10  The lyrics -- and, Judge, I put the website on -- in the bond

11  motion so Your Honor could go and look and read some of the

12  lyrics.  But they're the most positive lyrics.  Talking about

13  the love of one another and how we all have to come together no

14  matter our political views.  It's totally opposed to the way

15  that the Government is trying to portray Mr. Watson, Judge.

16  Mr. Watson is the person that will hold the door open for seven

17  people in a row at a convenience store.  He is the person that

18  will help friends and family with their opioid dependence.

19  He's the person that will stop on the side of the road to help

20  someone no matter who they are, Judge.  And, again, Your Honor

21  has those letters, and I was able to obtain those letters in a

22  short amount of time, and there's more letters coming in.  I

23  saw some go to my email as I'm sitting here today in front of

24  Your Honor.  That's the amount of community support that

25  Mr. Watson has.  And they're going to keep coming in because

1  they're the people that really know who he is.  And who he is,

2  he's not a threat to anyone, Your Honor.

3      What I can say, Judge, again, if we're going about his

4  political beliefs and his nonaggression principle where he

5  believes you do not incite violence, you do not act violently

6  in any way, he's about as extreme as Martin Luther King, Jr.,

7  Judge.  His nonaggression is the opposite of extremism.  He's

8  advocating for change and using nonviolent means to bring about

9  that change, and I don't think that's something that should be

10  considered dangerous, Judge.

11      Your Honor, I would like to address some of the concerns in

12  the pretrial services report, and I will note that the

13  probation officer did recommend that he be detained; but I

14  don't think the probation officer had full information at the

15  time when that recommendation was made.  At the time, he gave

16  the residence as the apartment that he was living in at the

17  time of the offense; but what I can tell you, Judge, as Your

18  Honor heard here today, he'd be residing with his parents in

19  Hardy County.  A stable address that he can go back to in a

20  safe --

21      (Zoom distortion.)

22          MR. MCDERMOTT:  It also mentions in the report that

23  he used marijuana, Judge.  But, again, my client would be

24  willing to abstain from using any drugs, including marijuana.

25  And if that was a concern, Judge, I've already gotten set up to

1  begin outpatient treatment to make sure he abstains from any
2  marijuana use with the Full Circle Healing Center and Joann
3  Christian, Your Honor.  And she'd be willing to start seeing
4  him for outpatient treatment right away if he's released.  So I
5  think that can address any marijuana use or concern.
6      The other thing, Judge, the probation officer mentioned is
7  the lack of legitimate employment.  And as you heard his father
8  testify to here today, Your Honor, he's been gainfully employed
9  right until he was laid off before the pandemic, Judge.  That's
10 never been an issue with Mr. Watson, and he would be able to,
11 if the Court would allow him, to find employment again if he's
12 released on bond.
13     The other thing I'd note, Judge, there was concern about
14 prior arrests and convictions.  The only convictions that
15 Mr. Watson had I think was for a driving offense, a speeding
16 offense that I saw in the pretrial services report, Judge.  The
17 other, there was a possession of a handgun offense.  And that
18 was I believe taken care of (indiscernible) before judgment,
19 and so there was no conviction there, Judge.  And going back to
20 that, Your Honor -- and I think this is important.  So there
21 was an occasion when Tim was pulled over and arrested by a law
22 enforcement officer for carrying a handgun.  There's no
23 indication that he obstructed justice in that arrest.  There's
24 no indication that he threatened the officers in that arrest.
25 There's no indication that he otherwise cooperated as any

1  citizen would with the law enforcement officers in that arrest,

2  Judge.  And that's exactly what Mr. Watson did when he was

3  arrested in this case, Judge.  He cooperated with the officers.

4  He didn't fight them.  He didn't threaten them.  He didn't try

5  to act in any violent way towards them despite the fact that he

6  had a handgun on his person, Judge.  That's not him.  That's

7  not the way that he acts, Judge.  And, again, you can separate

8  that from, you know, excited utterance saying, oh, if someone

9  comes in like they came in on Duncan Lemp, I'm going to shoot

10 them.  If someone tries to shoot me, I'm going to shoot them.

11 Those are things that are said in the heat of the moment,

12 Judge, between him and a loved one.  That's not how he acts as

13 can be seen in the way that he's acted in this case and

14 previously when confronted by law enforcement officers, Judge.

15     So I think that many of those concerns have been addressed

16 in this bond hearing here today and in the filing that we filed

17 before this bond hearing that I think that there are reasonable

18 conditions of his release that can ensure his appearance and

19 get the safety of the community.  The other thing, Judge, that

20 I will note in terms of bond -- and, again, this is important

21 because he has a right to counsel.  And of course, you know,

22 we're going forward with this hearing today as convened because

23 he wants to go forward with this hearing today, but I'm not

24 there in person to be there with him.  But, Judge -- and this

25 is important.  When he's being held at the jail with the COVID

1   pandemic in place, it's very hard to be able to meet with my

2   client and prepare a defense.  I was able to get in there

3   before I had this issue come up where I had to take a test, a

4   COVID test, but I wasn't able to talk to him since I last met

5   with him on Thursday, Judge.  That was the last time I talked

6   to him.  I was not able to get a phone call with him at the

7   jail despite trying and trying to get a message back to him to

8   set it up, Judge.  And that's just the fact of the way that

9   we're living today with the COVID pandemic, but it infringes

10  upon his ability to consult with counsel being held there

11  pretrial, Judge.  And I think that with putting conditions in

12  place that I've recommended that we can ameliorate that and

13  have something in place where I can meet with him outside of

14  the jail.

15      And so, Judge, again, I would conclude here today by saying

16  that the Government -- and Your Honor is aware -- has the

17  burden to prove by clear and convincing evidence that there is

18  no conditions that would reasonably assure his appearance and

19  the safety of the community, Judge.  And, again, I would

20  suggest that the Government has not met its clear and

21  convincing evidence burden here today.  Again, there's no

22  evidence whatsoever that Tim has ever acted in a violent

23  manner.  The Government doesn't have it because it doesn't

24  exist, Judge.  There's nothing to suggest that he's acted

25  violently previously or will act violent in the future, Judge.

1      Again, what I would say that is any connection they're

2   trying to paint him to a violent extremist movement, Judge,

3   it's unproven and untrue.  This is -- the Tim that I know and

4   have learned over the past few days, and his family more

5   importantly knows, is not the person that they're trying to

6   portray in here as today.  He's the person that puts family and

7   loved ones ahead of anything else, and he is not going to

8   violate the law, Judge.  He's not going to violate his

9   conditions for release.  And I think with everything proposed

10  here today that this Court can be reasonably assured that he

11  will appear, he will not violate, and that the person that the

12  Government is trying to portray today is not the person that he

13  actually is, Judge.  So I'd asked that he be released on bail.

14      Thank you, Your Honor, for listening to me and dealing with

15  my voice that's fading right now.

16          THE COURT:  Thank you, Mr. McDermott.

17      Anything further, Mr. Douglas?

18          MR. DOUGLAS:  No, Your Honor.

19          THE COURT:  All right.  The Court will take the issue

20  of bond under advisement.  We've heard a lot of evidence here

21  today, and I certainly want to give that the time and

22  consideration necessary to consider that particular motion.

23      Let's turn then to the last matter on today's docket as far

24  as this case is concerned and that is the arraignment.

25      Mr. McDermott has the defendant had an opportunity to

1  review the original indictment with counsel, sir?

2          MR. MCDERMOTT:  We have prior to this hearing, Judge.

3          THE COURT:  All right.  And does the defendant waive

4  the reading of the original indictment in open court?

5          MR. MCDERMOTT:  He would waive the reading of the

6  indictment in open court, Judge, and he'd enter a not guilty

7  plea to all the charges contained in the indictment.  We'd also

8  be requesting discovery here today from the Government.

9          THE COURT:  All right.  Discovery and inspection is

10  being requested.  All right.  Very well.  With that in mind,

11  Counsel, these will be the dates and times utilized for your

12  trial and pretrial with regard to this matter.  Government

13  disclosures are due November 24, 2020.  Reciprocal discovery is

14  due December 1, 2020.  Exculpatory evidence is to be disclosed

15  by November 24, 2020.  All motions that you need to file need

16  to be filed by December 8, 2020, and responses are due December

17  15, 2020.  If a hearing is required on any motion, we'll

18  conduct that hearing on December 16, 2020, at 1:30 P.M.  Your

19  Rule 404(b), *Jencks, Roviaro*, and *Giglio* disclosures are due

20  December 21, 2020.  Your voir-dire, instructions, and motions

21  in limine are due December 23, 2020.  Your witness and exhibit

22  lists are due December 21, 2020.  All plea agreements are to be

23  submitted to the Court by January 5, 2021.  Your final pretrial

24  conference before Judge Groh is set for January 7, 2021,

25  starting at 9:30 A.M.  And finally with jury selection and

1  trial to commence on January 12, 2021, at 9:00 A.M.

2      All right, Counsel, anything further that we need to

3  address before we adjourn this afternoon?

4          MR. DOUGLAS:  Not by the Government, Your Honor.

5          MR. MCDERMOTT:  No, Your Honor.  And I appreciate you

6  giving us the time in dealing with these technical issues.  And

7  can I just have a minute to talk to my client on the phone

8  before he's being taken out of the courtroom, Judge?

9          THE COURT:  Yes.  And just give me --

10         MR. MCDERMOTT:  It doesn't have to be on the record

11  though.

12         THE COURT:  Yeah.  We're not going to put anything on

13  the record.  As a matter of fact, if there's nothing further,

14  the defendant is remanded to the custody of the U.S. Marshal

15  Service, and we stand adjourned.  We'll kill any of the

16  microphones and mute that and allow you to discuss with your

17  client before he's taken back to the Eastern Regional Jail.

18         MR. MCDERMOTT:  Thank you, Judge.

19

20              (Hearing concluded at 5:07 P.M.)

21

22

23

24

25

1                              CERTIFICATE

2

3           I, Kate A. Slayden, Registered Professional Reporter

4    and Official Court Reporter of the United States District Court

5    for the Northern District of West Virginia, do hereby certify

6    that the foregoing is a true and correct transcript to the best

7    of my ability of the digitally-recorded proceedings had in the

8    above-styled action on November 17, 2020, as transcribed by me.

9           I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial Conference of

11   the United States.

12          Given under my hand this 2nd day of December, 2020.

13

14

15                         /s/Kate A. Slayden

16                         Kate A. Slayden, RPR, CCR
                           Official Reporter, United States
17                         District Court for the Northern
                           District of West Virginia
18

19

20

21

22

23

24

25