**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA,**

v.                                                                                      **Criminal Action No. 3:20-CR-42
(GROH)**

**TIMOTHY JOHN WATSON,**

          Defendant.

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR REVOCATION OR AMENDMENT OF DETENTION
ORDER**

      Comes now the United States of America and William J. Powell, United States Attorney for the Northern District of West Virginia, by Jarod J. Douglas, Assistant United States Attorney for said District, and respond in opposition to the defendant's Motion for Revocation or Amendment of Detention Order [Doc. 45], filed February 4, 2021, asking this Court to revoke or amend the Detention Order [Doc. 32], entered November 23, 2020.

        **I.**      **BACKGROUND**

**A.**    **Detention Hearing**

      On November 17, 2020, a Federal grand jury sitting in Martinsburg returned the instant Indictment [Doc. 23], charging the defendant with the possession and transfer of machinegun conversion devices, also known as "drop in auto sears," and the possession of a firearm silencer.

      On November 17, 2020, following the return of the Indictment, U.S. Magistrate Judge Robert W. Trumble conducted a two-and-a-half hour-long detention hearing [Doc. 27]. The Court heard testimony from the FBI case agent, who presented several photographs of items seized from the defendant on the day of his arrest and a video of an ATF examiner test-firing a semi-

1

automatic weapon without and with the auto sear the defendant had manufactured. The Court also heard a lengthy proffer from defense counsel as well as the testimony of each of the defendant's parents [Doc. 29]. The Court also heard argument from counsel, including an approximately 45-minute long argument from defense counsel.

**B.     Detention Order**

On November 23, 2020, U.S. Magistrate Judge Trumble entered the subject Detention Order [Doc. 32], directing that the defendant be detained pending trial. The Court based its decision on a finding that clear and convincing evidence had been presented that the defendant is a danger to the community and that no bond conditions could be set to ensure the safety of the community. The Court provided a thorough and detailed explanation of the not fewer than **eight** reasons in support of this decision.[1]

First, the Court found that "Defendant's business of selling and manufacturing 'portable wall hangers' caters to members of an extremist political movement referred to as 'Boogaloo,'" noting evidence that "[h]is business website encourages the use of false names and ten percent of all his business proceeds for March 2020 were donated directly to a GoFundMe page, 'Justice for Duncan Lemp,' a known martyr for the Boogaloo movement." ([Doc. 32] at ¶ 3).

Second, the Court found that "[t]hese 'portable wall hangers' are used to modify semi-automatic assault rifles into fully automatic machine guns." In this regard, the Court emphasized that "one of his clients shot and killed a federal guard [and] [a]nother of his clients believed he was supplying international terrorists with these 'portable wall hangers' when arrested by federal

---

[1] Though not directly related to the danger to the community finding, this Court also found that "[t]he weight of evidence against the defendant is strong and if convicted, he is subject to lengthy period of incarceration." ([Doc. 32] at ¶ 2).

2

agents." Finally, the Court noted that "Defendant has over 800 clients in 50 states." ([Doc. 32] at ¶ 4).

Third, the Court found significant evidence of statements the defendant had made because he was "disgruntled with the IRS because he could not pay his taxes with cash during COVID." Specifically, the Court noted that "Special Agent McNeal testified that there were recordings on electronic devices seized during the investigation where the Defendant states, 'Those people need to [f***ing] die' and 'Before COVID-19 ends, the world might call me a crazed gun man.'" The Court also noted that "Special Agent McNeal testified in relation to the IRS incident, that Defendant told his girlfriend, that he was going to 'kill 'em,' 'blow up the building,' and/or 'deface federal property.'" ([Doc. 32] at ¶ 5).

Fourth, in response to the defendant's character references, the Court stated its "concern" that "Defendant has changed over the years and his propensity for violence has escalated as is evidenced by his statements." In this regard, the Court noted that "Special Agent McNeal obtained his girlfriend's journal, where she wrote, 'What happened to the Tim I used to know and what Tim will I get today.'" Similarly, the Court noted evidence that "Defendant told his girlfriend that if anyone came to his door for arrest or search warrant [meaning law enforcement], it would not be pretty." ([Doc. 32] at ¶ 8).

Fifth, the Court emphasized that, at the time of the defendant's arrest, he "had a loaded gun, three loaded magazines with hollow point bullets, and a knife on his person." The Court also noted that a search of the defendant's residence "revealed two loaded hand guns on his nightstand, a loaded rifle beside his bed, and another rifle fitted with a silencer in his bedroom." ([Doc. 32] at ¶ 9).

3

Sixth, the Court found significant that, at the time of the defendant's arrest, he "asserted that he was being kidnapped and continued to assert the same in recorded phone calls to his parents from the jail."  ([Doc. 32] at ¶ 10).

Seventh, the Court found noteworthy that, following his arrest, the defendant "asked his parents to get in touch with his girlfriend because he needed to marry her immediately."  ([Doc. 32] at ¶ 10).

Eighth, the Court found that the defendant's "actions and behaviors" were indicative of someone who "attempts to circumvent rules/laws[.]"  Therefore, the Court found that the defendant is not "a good candidate for release under terms and conditions set by this Court."  ([Doc. 32] at ¶ 11).

**C.     Defendant's Motion for Reconsideration**

On January 18, 2021, nearly two months following the entry of the Detention Order, the defendant filed a motion [Doc. 41], asking U.S. Magistrate Judge Trumble to reconsider the detention decision.  The defendant presented four grounds for reconsideration, all based in a theory of "new evidence," namely:  (1) Dr. Sara Boyd, a retained clinical psychologist, issued a report on January 12, 2021, opining that the defendant is "a relatively low risk of violent re-offense"; (2) Emily Cross "has offered clarification of the Government's evidence and has indicated that she does not believe [the defendant] is a violent person"; (3) three friends of the defendant "can all testify that [the defendant] never acted in a violent manner in their presence and never advocated for violence or threatened violence"; and (4) "the conditions at the Eastern Regional Jail put his health and safety and risk and deny him the opportunity to fully participate and assist counsel in preparation of a defense."

4

On January 27, 2021, U.S. Magistrate Judge Trumble entered an Order Granting in Part and Denying in Part Defendant's Motion for Reconsideration of Detention Order [Doc. 43]. Specifically, the Court found that "the only new evidence that was not known to the movant at the time of the hearing was Dr. Boyd's report," thus granting the motion in this regard. Id. at 1. However, the Court found that Dr. Boyd's report did not "change [its] position expressed in its previous detention order that defendant is a danger to the community and that no further hearing is necessary," thus denying the motion. Id. at 2.

**D.      Defendant's Motion for Revocation or Amendment**

On February 4, 2021, approximately 10 weeks following the entry of the Detention Order, the defendant filed the instant motion [Doc. 45], asking this Court to revoke or amend the Detention Order to release him because he is not a danger to the community.

## II.      APPLICABLE STANDARD

Title 18, United States Code, § 3142(g) provides the specific factors that are to be considered to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. Those factors are:

1. The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

2. The weight of the evidence against the person;

5

3. The history and characteristics of the person, including but not limited to community ties, employment, criminal history, record of court appearance or whether the person was on probation or parole at the time the current offense was committed; and

4. The seriousness of the danger to any person or the community that would be posed by the person's release.

Title 18, United States Code, § 3142(b) authorizes the "a court having original jurisdiction over the offense" to revoke or amend a detention order based on a de novo review. United States v. Clark, 865 F.2d 1433, 1436 (4th Cir. 1989). However, the Court need not hold a second detention hearing. See United States v. Toler, 684 F.Supp. 436, 437 (S.D.W.Va. 1988) (Haden, C.J.).

### III.    ARGUMENT

The defendant presents two primary grounds for revocation and amendment of the Detention Order, namely: (1) conditions of release can reasonably assure the Court that the defendant is not a danger to the community considering the § 3142(g) factors, and (2) detention hampers his ability to assist in the preparation of his defense due to the COVID-19 pandemic. For the reasons outlined below, neither of these bases alone, nor in combination, warrant revocation or amendment of the Detention Order.

**A.    Section 3142(g) Factors**

As the Magistrate Judge found after a two-and-a-half hour-long detention hearing and reviewing the defendant's motion for reconsideration, the § 3142(g) factors weigh in favor of detention on the danger to the community prong.

i.  **The Nature and Circumstances of the Offense Charged**

The Magistrate Judge made the following findings regarding the nature and circumstances of the offense charge:

- The defendant was engaged in a business that "cater[ed] to members of an extremist political movement," as evidenced in part by it indication that "ten percent of all his business proceeds for March 2020 were donated directly to a GoFundMe page, 'Justice for Duncan Lemp,' a known martyr for the Boogaloo movement."  ([Doc. 32] at ¶ 3).

- "His business website encourages the use of false names . . .."  Id.

- The products of this business are "are used to modify semi-automatic assault rifles into fully automatic machine guns."  ([Doc. 32] at ¶ 4).

- "Defendant has over 800 clients in 50 states."  Id.

- One customer "shot and killed a federal guard."  Id.

- Another customer "believed he was supplying international terrorists" with the products.  Id.

In the instant motion, the defendant states that there is no evidence that he engaged in acts of violence nor that he advocated that others engage in acts of violence.  The defendant asserts that he conducted the business openly.  The defendant notes that there is no evidence that the customer who shot and killed a federal guard used his product to do so or that he had any communications with the customer.

Evidence that the defendant engaged in acts of violence or advocated that others do so is not necessary for detention here.  The defendant did not conduct the business openly.  His website encouraged customers to use false names.  This indifference to the real identities of his

7

customers, the sheer number of customers, and the true purpose of the product being sold combined to present a serious danger to the community. Therefore, the nature and circumstances of the offense weigh in favor of detention.

      **ii.      The Weight of the Evidence against the Person**

The evidence against the defendant includes the following, as outlined in the Criminal Complaint [Doc. 1], the Indictment [Doc. 23], and the government's Detention Hearing exhibits [Docs. 29-1 through 29-5]:

- Screenshots of the defendant's website.
- Email messages between the defendant and his customers.
- Instagram messages between the defendant and his customers.
- A controlled purchased of drop in auto sears from the defendant.
- Drop in auto sears and the 3D-printers used to manufacture them, seized from the defendant's residence.
- Expert opinion from an ATF examiner that these products constitute drop in auto sears.
- A firearm silencer seized from the defendant's residence.
- Expert opinion from an ATF examiner that this item is a firearm silencer.

In the instant motion, the defendant addresses the weight of the evidence in two ways. First, he argues that these products are not drop in auto sears. Second, he appears to assert his First Amendment right to freedom of speech by alleging that his manufacture of these items was "a political statement, in [his] view, about the absurdity of some of the gun laws . . . ." ([Doc. 45] at 9). The defendant presents no expert support for the first and surely knows, or should be advised, that the second is not a defense. Accordingly, the weight of the evidence weighs in favor

of detention.

### iii. The History and Characteristics of the Person

The Magistrate Judge made the following findings regarding the natured and circumstances of the offense charge:

- The defendant stated in a recording on an electronic device seized during the investigation that certain "people need to [f***ing] die" and that "before COVID-19 ends, the world might call me a crazed gun man." ([Doc. 32] at ¶ 5).

- A journal kept by the defendant's live-in girlfriend quoted the defendant as stating he was going to "kill 'em," "blow up the building," and/or "deface federal property." ([Doc. 32] at ¶ 8).

- The same journal included a question the girlfriend wrote, "What happened to the Tim I used to know and what Tim will I get today." Id.

- The defendant told his girlfriend that, if anyone came to his door for arrest or search warrant [meaning law enforcement], "it would not be pretty." Id.

- At the time of the defendant's arrest, "he had a loaded gun, three loaded magazines with hollow point bullets, and a knife on his person." ([Doc. 32] at ¶ 9).

- A search of the defendant's residence "revealed two loaded hand guns on his nightstand, a loaded rifle beside his bed, and another rifle fitted with a silencer in his bedroom." Id.

- At the time of the defendant's arrest, he "asserted that he was being kidnapped and continued to assert the same in recorded phone calls to his parents from the jail."

- Following the defendant's arrest, he "asked his parents to get in touch with his girlfriend because he needed to marry her immediately." ([Doc. 32] at ¶ 10).

9

In the instant motion, the defendant presents two primary arguments regarding his history and characteristics: (1) "the proffer of testimony" of Emily Cross "has materially changed," and (2) "an objective psychological evaluation has determined that [he] is at a low-risk for violence." ([Doc. 45] at 11).

### 1. Emily Cross

The defendant asserts that Emily Cross "would testify that she had never seen [him] act violently during her relationship with him, but [that he would] often be[] angry and short-tempered with her when they argued[,]" and "that she has never heard [him] advocate for violence, that he still believed in the Non-Aggression Policy at the time of his arrest, that [he] did not belong to the so-called Boogaloo movement, that she did not believe that [he] would be a danger to anyone if released on bail, and that she believed [he] would obey all conditions of pre-trial release." ([Doc. 45] at 18).

That Emily Cross would purportedly testify that she does not believe the defendant is a violent person is not a "material change" from what was presented at the detention hearing. At the outset, any "new" information from Emily Cross should be considered in the context of the defendant's clear intent to be obstructive when he suggested to his parents that he and Emily should marry "immediately," a fact recorded during a jail call to which the FBI agent testified at the detention hearing. In any event, the proffered testimony does not change what she wrote in her diary prior to any knowledge of a federal investigation or prosecution. The proffered testimony does not change her report to law enforcement regarding the defendant's "it would not be pretty" statement. Significantly, the defendant does not proffer that Emily Cross is prepared to retract those statements. Accordingly, the proffered testimony of Emily Cross does not warrant

10

revocation or amendment of this Court's detention determination.

### 2. Dr. Boyd's Report

As an initial matter, the government notes that Dr. Boyd's ultimate opinion is that the defendant presents a "relatively low risk of violent re-offense." However, the government believes that "violent re-offense" is a narrower concept than the danger to the community element of the Bail Reform Act. In other words, the defendant can (and does) present a danger to the community that may not rise to the level of a new a criminal offense.

Moreover, with all due respect to Dr. Boyd and her qualifications, the government has concerns that Dr. Boyd reviewed pertinent cases documents, including the Criminal Complaint, the transcript of the detention hearing, and this Court's Detention Order, but still opines that the defendant presents a "relatively low risk of violent re-offense." The concern is based in the fact that Dr. Boyd appears to place more than appropriate reliance on the subjective risk assessment she conducted of a defendant who is aware that he faces years in federal prison, as compared to the objective evidence that existed prior to the defendant becoming aware that he was under federal investigation or prosecution. In any event, Dr. Boyd's report should not receive any more weight than the other items of evidence, which the Magistrate Judge appropriately relied on to detain the defendant. On balance, Dr. Boyd's report should not cause this Court to revoke or amend the Detention Order.

### iv. The Nature and Seriousness of the Danger Posed

The defendant does not address the nature and seriousness of the danger his release would pose to the community because, of course, he argues that he does not pose any danger. The objective evidence paints a different picture. The defendant is quick to agree that he is a "staunch

11

supporter of Second Amendment rights" and deny that he belongs "to any so-called Boogaloo movement and would reject any ideology that is based upon violence." ([Doc. 45] at 9). But he remains silent on his wild claims that law enforcement officers executing a lawfully issued arrest warrant (which they showed him) were kidnapping him, claims he made at the time of his arrest and days later after an opportunity for reasonable reflection. Moreover, the defendant cannot change that fact that a journal kept by his live-in girlfriend quoted him as stating he was going to "kill 'em," "blow up the building," and/or "deface federal property." He also cannot change the fact that he told her "if anyone came to his door for arrest or search warrant [meaning law enforcement], it would not be pretty." Based just on these items of uncontroverted evidence, the nature and seriousness of the danger the defendant poses if release is grave.

**B.    COVID-19 Pandemic**

Conditions at the Eastern Regional Jail relating to COVID-19 do not bear on this Court's determination that the defendant presents a danger to the community that conditions of release cannot alleviate. Accordingly, for this reason alone, this line of argument should be rejected as a basis for reconsideration.

Moreover, while there was an outbreak of COVID-19 at the Eastern Regional Jail in December 2020, there are zero active cases at the jail with 280 inmates recovered as of February 7, 2021 at 3:00 p.m.    See    WV DHHR Website, https://dhhr.wv.gov/COVID-19/Pages/Correctional-Facilities.aspx, Feb. 7, 2021. Finally, the complex case schedule, with a trial date in April 2021, should alleviate any temporary inconvenience that COVID-19 caused to the preparation of his defense. If not, then a motion to continue is the appropriate recourse, not

the release of the defendant, whom the § 3142(g) factors weigh heavily in favor of detaining.[2]

## V. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court affirm the Magistrate Judge's decision that no condition or combination of conditions or release would assure the safety of the community pending trial, without the need for an evidentiary hearing. In addition, the United States asks this Court to further find that the ongoing coronavirus pandemic does not provide a sufficient basis to alter the conclusion that detention is warranted.

    Respectfully submitted,

    WILLIAM J. POWELL
    UNITED STATES ATTORNEY

By:   /s/ Jarod J. Douglas
        Jarod J. Douglas
        Assistant U. S. Attorney

---

[2] The government does not dispute that the discovery in this case in voluminous. However, the defendant's reference to a two-terabyte hard drive provided by the government recently is a red herring. First, the hard drive contains data from the defendant's <u>own</u> electronic devices that were seized from his residence. Second, the government has not completed its assessment of what evidence, if any, it will use from the electronic devices, as analysis is ongoing. In this regard, the undersigned has promised defense counsel that the government will direct him to any particular items the government intends to use, in the near future.

13

**CERTIFICATE OF SERVICE**

I, Jarod J. Douglas, Assistant United States Attorney for the Northern District of West Virginia, hereby certify that on the 8th day of February 2021, the foregoing UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR REVOCATION OR AMENDMENT OF DETENTION ORDER was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Shawn McDermott, Esq.
Mills McDermott Criminal Law Center
1800 West King Street
Martinsburg, WV 25401
*Counsel for Defendant*

WILLIAM J. POWELL
UNITED STATES ATTORNEY

By:   /s/Jarod J. Douglas
Jarod J. Douglas
Assistant U. S. Attorney